UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

```
UNITED STATES OF AMERICA       :
                               :
     v.                        :      File No. 1:05-CR-133-01
                               :
RICHARD E. MOSES               :
_____  :
```

<u>RULING ON DEFENDANT'S PRE-TRIAL MOTIONS</u>
(Paper 61)

Defendant Richard E. Moses ("Defendant") has filed a variety of pretrial motions.  For the reasons set forth below, the Motion to Dismiss and/or Suppress is DENIED, the Motion to Sever is GRANTED in part and DENIED in part, and the Motion to Compel Discovery is DENIED as moot.

<u>Background</u>

Based upon the record, including the testimony offered at the June 12, 2007 hearing, and the various exhibits attached to Defendant's motions (Paper 61, Appendix to Documents Volumes I and II) which the parties agreed could be considered by the Court in deciding the motions, the Court finds the following facts.

The Defendant has several past convictions for dealing cocaine in the Vermont-New Hampshire area and is well known to local law enforcement.  On May 9, 2005, Vermont State Police intercepted Defendant's accomplice, Steven Downer, while speeding south on Interstate 91.  The car Downer was driving was found to contain $1,200, needles, and a set of digital scales.  Downer

1

cooperated with law enforcement and explained Defendant had rented the car and that Downer was en route to Hartford, Connecticut to pick up cocaine for Defendant.

In an unrelated Connecticut investigation, Jorge Burgos was arrested on June 23, 2005 in Hartford, Connecticut, and likewise described supplying cocaine to Defendant for sale in Vermont.  On July 6, 2005, Damon Hubbert was arrested in Springfield, Missouri on a federal arrest warrant issued in the District of Vermont for cocaine trafficking.  Hubbert told officials he had obtained bulk cocaine for Defendant in the past few years.

In August 2005, Burgos, cooperating with Connecticut law enforcement, negotiated with Defendant by telephone to provide him a half-kilogram of cocaine for $6,000 and some guns.  On August 20, 2005, Defendant sent his cousin, Scott Rogers, to meet Burgos in Hartford, Connecticut, where Rogers was arrested and subsequently decided to cooperate with law enforcement.  He was indicted in Vermont on November 16, 2005 for possession of a firearm in relation to a drug trafficking crime.

On December 7, 2005, Defendant was indicted on charges of conspiring to distribute cocaine and possessing a firearm during and in relation to a drug trafficking crime, and U.S. Magistrate Judge Jerome J. Niedermeier issued search warrants for Defendant's residence in Strafford, Vermont, and a garage he owned in Sharon, Vermont.

2

In the early morning hours of December 8, 2005, with guns drawn, Agent Trevor Carbo ("Carbo") of the Vermont State Police, assigned to the Drug Enforcement Administration ("DEA"), and other law enforcement agents arrested Defendant and searched his home pursuant to the warrants.  Upon securing the home, guns were holstered and agents removed Defendant's handcuffs to allow him to use the bathroom.

Thereafter, Carbo sat down with Defendant in the living room and said he would like to ask some questions.  As a preface to any questioning, Carbo said he was aware of Defendant's prior arrest in New Hampshire which had familiarized Defendant with the Miranda process and the fact that he had cooperated with New Hampshire authorities, all of which Defendant acknowledged. (Defendant himself testified he was familiar with his Miranda rights when agents showed up at his house on December 8, 2005.) Carbo then Mirandized Defendant without obtaining a written Miranda waiver.[1]  After Defendant confirmed he understood his Miranda rights, Carbo explained he would like to speak "man-to-man," appreciated honesty, and Defendant was free to say he did not wish to speak about certain topics.

---

[1]Defendant testified he was only read his Miranda rights after Carbo had questioned him, when they were preparing to leave Defendant's home.  On this issue, the Court finds credible Carbo's testimony that he did, in fact, Mirandize Defendant before asking any questions.

A conversation between Carbo and Defendant ensued during which Defendant made a number of statements.  The questioning lasted for no more than one and a half hours with a break in the middle.  At some point, although it is unclear exactly when, Carbo intimated Defendant was looking at a considerable amount of prison time and any cooperation could be favorable to him down the road.[2]  Defendant was reluctant to discuss certain areas and spoke more freely about others.  At all times during the conversation Defendant appeared relaxed, calm, and cordial, and was comfortable enough to ask for, and receive, a cup of coffee.

On the same day as his arrest, Defendant was arraigned by Judge Niedermeier, released on conditions and ordered to retain counsel.  Prior to his indictment, Defendant had consulted with an attorney who had a conversation with AUSA Elizabeth Woodcock about the government's investigation.  Defendant did not hire that attorney after he was indicted, however, but rather retained Attorney Nancy Waples, who filed her appearance with the Court on December 19, 2005.  On December 9, 2005, Magistrate Judge Niedermeier issued the Court's standard Criminal Pretrial Order.

While cooperating with DEA agents, Rogers had told them Defendant had attempted to tamper with a witness.  After Defendant's arrest, Rogers indicated Defendant would either

---

[2]Defendant testified Carbo said his grandchildren would be old by the time he got out of jail.

4

threaten him or offer to pay him to keep quiet regarding his criminal activities.  On December 8, 2005, therefore, Carbo provided Rogers with a voice recorder and instructed him to record calls received from Defendant.  In addition, Carbo specifically instructed Rogers to avoid any conversations with Defendant about Defendant's pending charges, or to otherwise entice Defendant to call him.

On December 19, 2005, Rogers told Carbo of a phone conversation with Defendant which included representations of Defendant's conversations with Attorney Waples in which she made certain comments about Carbo's reputation which would be helpful in Defendant's case.

On December 23, 2005, Carbo, in consultation with AUSA Woodcock, decided to retrieve the recording device from Rogers as there had been no calls indicating Defendant intended to threaten a witness.  But in conversing with Rogers that day, he was told Defendant had in fact mentioned killing Burgos in an earlier conversation.  The government decided to allow Rogers to receive and record incoming calls from Defendant.

Between December 23, 2005 and January 9, 2006, Rogers and Defendant had several conversations about hiring someone to kill Burgos, which were passed on to Carbo.

To gauge the seriousness of Defendant's threat, the government planned to monitor a face-to-face meeting between

Rogers and Defendant.  Rogers was instructed to tell Defendant at any subsequent meeting that he knew someone who might know how to have someone eliminated.  He was also instructed not to affirmatively seek any information relating to the 2005 charges.

On January 9, 2006, Rogers met Defendant in a parking lot in White River Junction, Vermont.  Agents fit Rogers with an electronic microphone which allowed them to hear Defendant's voice, his serious inquiry about having Burgos murdered, as well as his opinion that it would be "sweet" if Rogers' contact could perform the killing for only $1,000.

After the January 9 meeting, the government brought in undercover DEA Agent David Rodriguez to pose as a hit-man and continue the investigation of Defendant's threat to Burgos. After a series of recorded telephone conversations with Rodriguez, Defendant agreed to pay Rodriguez $7,500 for the killing.

On March 23, 2006, Defendant and Agent Rodriguez agreed to meet at the parking lot of a grocery store in Brattleboro, Vermont.  Despite being given the opportunity to change his mind, Defendant provided a 50%, $3,500 down payment.  The agent left, and Defendant was arrested.

In a March 29, 2006 Indictment, Defendant was charged with one count of causing another to travel in interstate commerce with the intent to murder.

A fifteen-count Superseding Indictment dated June 20, 2006 combines the various cocaine trafficking, firearms, witness tampering and forfeiture charges against Defendant.  See Paper 44.

## Discussion

I.  Motion to Dismiss/Suppress

Defendant advances a myriad of reasons why dismissal of the Superseding Indictment and/or suppression of evidence is warranted.  Based on the following discussion, the Court concludes they are without merit.

    A.  Fifth Amendment

Defendant argues the statements made to Carbo on December 8, 2005 should be suppressed because he did not validly waive his Miranda rights and further, that his statements were involuntarily made.

        1.  Waiver

Once a person has been told of his Miranda rights, he may make a voluntary, knowing, and intelligent waiver of those rights.  For a waiver to be valid, the government must show by a preponderance of the evidence that "(1) . . . the relinquishment of the defendant's rights was voluntary, and (2) . . . the defendant had a full awareness of the right being waived and of the consequences of waiving that right."  United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995) (citing Moran v. Burbine,

7

475 U.S. 412, 421 (1986)).  In deciding the validity of a waiver, courts often focus on "how the defendant was advised of his rights, whether he indicated he understood his rights, and generally whether the defendant was capable of comprehending his rights."  United States v. Ortiz, 2007 WL 1521493, at *6 (E.D.N.Y. May 22, 2007).

Here, Defendant was well aware of his Miranda rights from his New Hampshire experience, was expressly informed by Carbo of his Miranda rights, and answered affirmatively when Carbo asked him whether he understood his rights.  Accordingly, the government has met its burden of showing by a preponderance of the evidence that Defendant knowingly and intelligently waived his Miranda rights.  The fact that Carbo did not obtain a written Miranda waiver does not change this conclusion.  See United States v. Turner, 926 F.2d 883, 888 (9th Cir. 1991) ("Miranda does not require that defendants acknowledge their rights in writing"); United States v. Boston, 508 F.2d 1171, 1175 (2d Cir. 1974) ("[i]t is clear . . . that a written waiver is not required").

Furthermore, because Defendant waived his rights under the same material conditions as he made statements to Carbo, the Court finds Defendant's waiver was voluntary, i.e., "the product of a free and deliberate choice rather than intimidation, coercion, or deception," Moran, 475 U.S. at 421, for the same

8

reasons the Court concludes below that his statements were voluntary under the Due Process Clause.  <u>See</u> <u>United States v. Siraj</u>, 424 F. Supp.2d 509, 516 (E.D.N.Y. 2006). ("[w]hen determining whether a defendant's waiver was voluntary, courts look to the same factors considered in determining whether a defendant's confession was voluntary under the Due Process Clause").

### 2.  <u>Voluntariness of statements</u>

The question of whether Defendant's statements to Carbo on December 8, 2005 were voluntarily given requires the Court to examine the totality of the circumstances and decide if "the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined."  <u>United States v. Guarno</u>, 819 F.2d 28, 30 (2d Cir. 1987) (internal quotation marks and citation omitted).  Relevant factors to consider include: "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." <u>Green v. Scully</u>, 850 F.2d 894, 901-02 (2d Cir. 1988).  The government must prove voluntariness by a preponderance of the evidence.  <u>See</u> <u>Lego v. Twomey</u>, 404 U.S. 477, 489 (1972).

Considering the totality of the circumstances, it is clear Defendant offered his statements voluntarily.  Defendant is a mature individual appearing to possess at least average

intelligence with a history of dealing with law enforcement.  He was treated courteously by the agents, including having his handcuffs removed to go to the bathroom and receiving a cup of coffee.  Additionally, Defendant made the statements while in the comfort of his home, the questioning lasted no more than one and a half hours, and there is no indication of physical abuse or affirmative acts of trickery or deceit.

The only aspect of the encounter which could in any way be seen as coercive are Carbo's comments concerning a lengthy jail sentence and leniency for cooperation.  These comments, however, are merely common sense factual observations about the predicament Defendant was in and the potential benefits of cooperation, and simply do not rise to a level of psychological coercion calculated to overbear Defendant's will.  See Simmons v. Bowersox, 235 F.3d 1124, 1133 (8th Cir. 2001) ("[a] truthful and noncoercive statement of the possible penalties which an accused faces may be given to the accused without overbearing one's free will") (citing United States v. Ballard, 586 F.2d 1060, 1063 (5th Cir. 1978)); United States v. Ruggles, 70 F.3d 262, 265 (2d Cir. 1995) ("statements to the effect that it would be to a suspect's benefit to cooperate are not improperly coercive").  Importantly, Defendant had the wherewithal to answer some questions and decline to answer others, which strongly shows Defendant's will was, in fact, live and kicking.

B.   <u>Sixth Amendment/Due Process</u>

Defendant argues the government violated his Sixth Amendment right to counsel by soliciting statements from him through cooperating witness Rogers while knowing Defendant was represented by counsel on the December 2005 charges.

"Law enforcement officials have a duty to investigate new or additional crimes that an indicted and represented defendant may have committed." <u>United States v. Ford</u>, 176 F.3d 376, 379 (6th Cir. 1999). Because of this duty, "officials may question an indicted defendant who has invoked his right to counsel if the questioning relates to offenses other than those that form the basis for his/her indictment." <u>Id.</u> Stated another way, the Sixth Amendment's right to counsel is "offense specific" and "cannot be invoked once for all future prosecutions." <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 176 (1991).

The Court finds no Sixth Amendment violations nor impropriety on the government's part. When the government was investigating the witness tampering crimes through Rogers, Defendant was only represented on the December 2005 charges by Attorney Waples. Defendant's right to counsel had not yet attached to the witness tampering crimes though, so the Sixth Amendment raises no bar to the government's investigation of those new crimes and the admissibility of statements concerning it. As already determined at the June 12, 2007 hearing, the

11

government will not attempt to introduce any incriminating statements related to the December 2005 charges elicited by Rogers after December 8, 2005.  See Maine v. Moulton, 474 U.S. 159, 180 (1985) ("incriminating statements pertaining to pending charges are inadmissible at the trial of those charges, not withstanding the fact that the police were also investigating other crimes").

Relatedly, Defendant contends his Sixth Amendment right to effective representation was impinged upon because Rogers acted as a "spy in the defense camp" by soliciting from Defendant defense strategy and privileged defense attorney communications. "[G]overnment interference in the relationship between attorney and defendant may violate the latter's right to effective assistance of counsel."  United States v. Ginsberg, 758 F.2d 823, 833 (2d Cir. 1985).  To show such a violation, Defendant "would need to establish that privileged information [was] passed to the government or that the government . . . intentionally invaded the attorney client relationship, and resulting prejudice."  Id. (internal quotation marks and citation omitted).  Defendant is unable to meet this standard.

In a sealed April 17, 2006 filing with the Court entitled "Memorandum of the United States Regarding Certain Contacts with and Statements by the Defendant" and "Supplemental Appendix" (Papers 37 and 38), the government set forth its procedure for

ensuring that any statements by Attorney Waples to her client would not be revealed to U.S. Attorney Thomas Anderson, who will now be prosecuting all the charges set forth in the Superseding Indictment.  As an initial matter, the record establishes any intrusion by Rogers was legitimate and justifiable as the government was acting on the reasonable belief Defendant was planning to murder a witness.  Thereafter, the stringent Chinese Wall put in place by the government prevented the passage of any privileged information to the prosecuting attorney.  In the absence of any evidence the Chinese Wall was breached, "there exists no realistic possibility of either prejudice to the defense or benefit to the government."  Id. at 833.  Furthermore, the prophylactic procedures employed by the government, as well as the instructions given to Rogers about the scope of his investigatory duties, satisfy the Court that the government did not intentionally invade the attorney client relationship.

For these reasons, the Court finds no Sixth Amendment violations or conduct that would "shock the conscience" so as to violate due process.  United States v. Chin, 934 F.2d 393, 398 (2d Cir. 1991).

C.   Discovery Violations

Defendant requests dismissal of the superceding indictment and/or exclusion of certain evidence for the government's failure to reveal Rogers as a witness and his role in the witness

13

tampering investigation.  If Rogers had been timely revealed, Defendant's argument goes, he would never have continued to converse with Rogers in December 2005/early 2006 and make incriminating statements.

The only clearly articulated discovery violation is the government's failure to provide notice that it was withholding a witness's name (Rogers) as required by II(A)(3) of the Court's pretrial order.  (Paper 13).[3]  Defendant's argument, therefore, rests on a faulty foundation - that is, even if the government had complied with II(A)(3) of the pretrial order, Defendant would have remained unaware that Rogers was a cooperating witness.

Even so, utilizing its broad discretion to remediate discovery violations, the Court finds dismissal and/or exclusion inappropriate.  There is no evidence of bad faith on the government's part and, most importantly, Defendant is unable to establish prejudice, which in the discovery context refers to a showing that the belated disclosure "adversely affected some aspect of his trial strategy." United States v. Adeniji, 31 F.3d 58, 64 (2d Cir. 1994).  This case is not one in which witnesses or statements are produced on the eve of or during trial.  Quite

---

[3]The Court finds nothing remiss under Fed. R. Crim. P. 16 or the pretrial order in the government not providing information related to the separate witness tampering investigation while it was ongoing, especially in light of the fact that the government will not be introducing any incriminating statements related to the December 2005 charges elicited by Rogers after December 8, 2005.

to the contrary, a trial date has not been set and Defendant has known the details of Rogers' involvement and the witness tampering investigation for more than a year, affording him ample opportunity to assess this information, investigate further, and otherwise fully prepare for trial.

Accordingly, the Court concludes the circumstances of the government's discovery violation do not warrant dismissal or exclusion of evidence.

D.   Other Reasons

The remainder of Defendant's reasons for dismissal and/or suppression are without merit.

Defendant's statutory speedy trial claim is that had the case "proceeded to trial on the initial drug case under the speedy trial time frames, the entire murder for hire case would not have occurred."  (Paper 61-2 at 5).[4]  This simply is not true, however, because the seventy-day statutory speedy trial period was not even close to expiring by the conclusion of the witness tampering investigation on March 23, 2006.  The Court's

---

[4]Although he refers to his constitutional right to a speedy trial, Defendant wholly fails to engage in the four-factor analysis relevant to such a claim.  See Barker v. Wingo, 407 U.S. 514, 530 (1972) (factors include (1) the length of the delay, (2) the reasons for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) any ensuing prejudice). Nevertheless, even assuming the first and third factors weigh in his favor, the second and fourth so clearly weigh against Defendant that they would defeat any constitutional challenge he may have wished to develop.

pretrial order, entered under 18 U.S.C. § 3161(h)(8)(A), tolled the time up to March 8, 2006 and Defendant's March 7, 2006 request to extend the pretrial motions deadline tolled the time until May 8, 2006.

As to Defendant's claim of entrapment on the witness tampering charges, the Court finds no conscience shocking government conduct rising to the level of a due process violation.  Defendant of course remains free to raise the affirmative defense of entrapment at trial.

Defendant's passing reference to the Vermont Constitution is unavailing because federal law governs this federal prosecution. See United States v. Pforzheimer, 826 F.2d 200, 204 (2d Cir. 1987).

## II.  Motion to Sever

Relying on Fed. R. Crim. P. 14, Defendant argues it would be highly prejudicial if he does not receive three separate trials on: (1) the drug and § 924 charges (Counts 1-7); (2) the witness tampering charges (Counts 8-12); and (3) the felon in possession charges (Counts 13 and 14).

Rule 14 allows a court to exercise its "sound discretion" and order separate trials where a defendant would be prejudiced by the joinder of offenses.  United States v. Blount, 291 F.3d 201, 209 (2d Cir. 2002).  To justify severance, a defendant must show he would be prejudiced so severely by a joint trial that his

16

constitutional right to a fair trial will be violated.  Id.  In
deciding whether to sever, the Court must weigh any prejudice
against gains in judicial efficiency that accompany a joint
trial.  See United States v. Werner, 620 F.2d 922, 929 (2d Cir.
1980).

     A.  Witness Tampering Charges

     Severance of the witness tampering charges is not required
to prevent unfair prejudice to Defendant.[5]  "[W]here evidence of
one crime is admissible at a separate trial for another crime, it
follows that a defendant will not suffer any additional prejudice
if the two offenses are tried together."  United States v.
Bergerstock, 1994 WL 449019, at *4 (N.D.N.Y. 1994) (quoting
United States v. Balzano, 916 F.2d 1273 (7th Cir. 1990)).  Here,
there is a significant likelihood of evidentiary overlap between
the drug related charges and the witness tampering charges.
Evidence of Defendant's witness tampering is most likely
admissible at trial to show guilty knowledge on the drug related
charges while evidence of the drug related charges would be
admissible to show Defendant's motive for engaging in witness
tampering.  See, e.g., United States v. Romero, 54 F.3d 56, 60
(2d Cir. 1995) (evidence of defendant's involvement with

_____

    [5]Although Defendant does not rely on Fed. R. Crim. P. 8 as a
basis for his motion, the Court pauses to note that a sufficient
nexus exists to permit joinder of the offenses because the
witness tampering charges involve a plan to eliminate evidence
related to Counts 1-7.

narcotics operation admissible to show motive to murder government witness).  Furthermore, proper jury instructions will minimize any prejudice - the jury will be instructed on the elements of each crime charged and told that each charge must be considered separately.

Accordingly, Defendant's motion to sever the witness tampering charges (Counts 8-12) is denied.

B.   Felon in Possession Charges

Severance and/or bifurcation of the felon in possession charges, however, presents another matter.  See United States v. DeSantis, 802 F.Supp. 794, 802 (E.D.N.Y. 1992) ("the problem [of Rule 14 prejudice] is particularly troublesome where a defendant is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g) in an indictment in which he is also charged with other crimes").  In recognition of this problem, the Second Circuit has clearly endorsed the view "that joinder of an ex-felon count with other charges requires either severance, bifurcation, or some other effective ameliorative procedure."  United States v. Jones, 16 F.3d 487, 492 (2d Cir. 1994).

Here, the government has not argued evidence of a prior felony conviction would be admissible in a separate trial of the other counts and the Court has no reason to believe it would be. The risk of unfair prejudical spillover therefore is far greater

18

than the witness tampering charges.  Moreover, the Court is not
convinced jury instructions alone constitute an effective
ameliorative procedure as contemplated by Jones.  On the one
hand, certain instructions could partially temper any prejudice.
Then again, they may not or they may have the opposite effect.
Cautioning the jury not to use evidence of a prior felony
conviction in deciding the other counts could simply serve to
reinforce in the jurors' minds the notion that Defendant is a
convicted felon.  As the Jones court observed, "[t]o tell a jury
to ignore the defendant's prior convictions in determining
whether he . . . committed the offense[s] being tried is to ask
human beings to act with a measure of dispassion and exactitude
well beyond mortal capacities."  Jones, 16 F.3d at 493 (quoting
United States v. Daniels, 770 F.2d 1111, 1118 (D.C. Cir. 1985)).

Accordingly, when weighed against the slight gain in
judicial efficiency in trying all of the counts jointly, the
Court concludes severance or bifurcation of the felon in
possession counts (Counts 13 and 14) is necessary to prevent
unfair prejudice to Defendant.  Whether to proceed by severance
or bifurcation will be adressed at the final pretrial conference.
The parties remain free to stipulate to their own effective
ameliorative procedure in lieu of severance or bifurcation.

19

III. <u>Motion to Compel</u>

Finally, Defendant's motion to compel disclosure is moot because as indicated at the June 12, 2007 hearing, the parties will endeavor to share all discoverable information and inform the Court if any disputes cannot be resolved.

<u>Conclusion</u>

For the aforementioned reasons, the Motion to Dismiss and/or Suppress is DENIED, the Motion to Sever is GRANTED in part and DENIED in part, and the Motion to Compel Discovery is DENIED as moot.  This case shall be placed on the first trial calendar after October 1, 2007.

Dated at Brattleboro, in the District of Vermont, this 9th day of August, 2007.


                              /s/ J. Garvan Murtha
                              J. Garvan Murtha
                              United States District Judge