UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA,            :
            Plaintiff               :
                                    :
        v.                          :        File No. 1:05-CR-133
                                    :
RICHARD E. MOSES, JR.,              :
            Defendant               :

RULING ON DEFENDANT'S MOTIONS TO WITHDRAW GUILTY PLEA
(Docs. 237 & 272)

Defendant Richard E. Moses, Jr. signed a plea agreement on August 11, 2008, the fourth day of his criminal trial.  The Court conducted a plea allocution and accepted Moses's guilty plea the same day, dismissing the jury.  Nearly seventeen months later, Moses moved to withdraw his plea of guilty.  Doc. 237.  The government opposes Moses's motion.  Doc. 241.  After two hearings on the issue and various supplemental affidavits, Moses submitted another motion to withdraw his plea based on new grounds.  Doc. 272.  The government opposes this motion as well.  Doc. 276.

I.   Background

Richard Moses was convicted on state charges in 2001 for dealing cocaine in the Vermont-New Hampshire area.  See Doc. 128. Events relevant to his federal case, however, begin in 2005.

Several individuals were arrested during the summer of 2005 for buying or selling significant quantities of cocaine.  Each implicated Richard Moses as being involved in a cocaine distribution network based in Orange County, Vermont.  In

particular, he was alleged to have imported cocaine from Connecticut in exchange for cash and guns.  Based on this evidence, a federal grand jury indicted Moses on December 7, 2005, charging him with one count of conspiracy to distribute five kilograms or more of cocaine, and one count of possessing a firearm in the course of drug trafficking.  See Doc. 1.  Moses was arrested in the early morning hours of December 8, 2005, and was arraigned and released on personal recognizance.

In the months following Moses's drug arrest, government agents continued to investigate him.  Based on information from a cooperating witness, agents suspected Moses might attempt to tamper with a witness against him in his drug case.  The government recorded various conversations and telephone calls, and introduced an undercover agent to Moses.  The agent posed as a "hit-man" and Moses discussed with the agent the possibility of having a witness in his drug case killed.  The plan became more concrete, and on March 23, 2006, Moses met the agent in person, paid him a down payment for the killing, and identified the intended victim.  At that point Moses was arrested again, this time on witness tampering charges.  See Doc. 32.  Following his second arrest, Moses was detained pending trial.  Doc. 36.

In the course of investigating the witness tampering charge, government agents inadvertently collected some information relating to Moses's legal case on the drug charges.  In

2

particular, a few conversations recorded by the government contained discussion of Moses's attorneys and what they had told him about his drug case. In order to avoid any impropriety, the government reassigned Moses's cases to new prosecutors who had not seen this information, and "screened off" those attorneys from others who had. The government also instructed both the cooperating witness and the investigating agents to not report any information relating to Moses's representation in the future. Doc. 37 (sealed memorandum by the United States). These efforts were largely prophylactic, as the inadvertently-collected information was of minor importance. Cf. Doc. 82 at 11 (ruling by the Court finding no Sixth Amendment violation).

On June 20, 2006, a grand jury returned a superseding indictment, charging Moses with fifteen counts of drug conspiracy, use of firearms in drug trafficking, the attempted contractual killing of a witness, and being a felon in possession of firearms. The indictment also contained a forfeiture count. See Doc. 44.

Moses's first retained attorney, Nancy Waples, Esq., moved to withdraw in July 2006, citing a breakdown in attorney-client relationship and Moses's failure to abide by the terms of his fee agreement. See Doc. 46. Moses also filed a pro se motion for appointment of CJA counsel, in which he stated he was unable to pay Ms. Waples for further legal work. See Doc. 51. Based on

Moses's representations of indigency, the Court relieved Ms. Waples as counsel and appointed John Mabie, Esq.

In the following months, Moses had various issues in prison, which apparently prompted him to go on a hunger strike. Mr. Mabie and the government were also discussing the possibility of a plea agreement at this time.  <u>See</u> Doc. 57 (sealed motion to continue by defendant).

In early 2007, Moses filed an omnibus pretrial motion, raising numerous arguments challenging the government's case and pretrial conduct.  Doc. 61.  Moses asked the Court to dismiss the charges against him, suppress certain evidence, and compel discovery, among other things.  The Court held a hearing on June 12, 2007, receiving testimony from a government agent as well as Moses and his former counsel, Ms. Waples.  After considering the parties' thorough briefing, the Court issued a ruling on Moses's pretrial motions on August 9, 2007.  <u>See</u> Doc. 82.  The Court denied the motion to dismiss on the merits, rejecting various defenses by Moses (including entrapment), and declined to suppress evidence or compel discovery.  <u>Id.</u>

Shortly thereafter, Moses attempted to file a pro se "Motion to Dismiss Assigned Counsel."  <u>See</u> Doc. 84-1.  In this paper he expressed "extreme disappointment" with his counsel, alleging Mr. Mabie "failed to file the proper pretrial motions for the dismissal of the charges," and that Mr. Mabie had "done nothing

4

for [Moses's] defense." Id. at 1-2.  As Moses was represented at
the time, the paper was not docketed and was returned to
Mr. Mabie, who accordingly moved to withdraw as counsel.  Doc.
84.  Mr. Mabie noted the extensive time and resources he had
devoted to the case, and observed that notwithstanding his
efforts, Moses appeared to lack "the necessary confidence in
. . . counsel to proceed with effective trial preparation."  Id.
at 2.  The Court held a hearing and granted Mr. Mabie's motion to
withdraw, appointing Kerry DeWolfe, Esq. as substitute counsel on
September 27, 2007.  Doc. 87.

On January 31, 2008, Ms. DeWolfe filed a number of new
pretrial motions on Moses's behalf, asking the Court to dismiss
the charges or suppress certain evidence, sever counts for
separate trial, and strike the panel of prospective jurors.[1]
See Docs. 93, 94, 95, 96.  After full briefing, the Court denied
the motions to sever and to suppress.  Doc. 110 (Order dated
March 24, 2008).  The motion to dismiss was consolidated for a
later hearing.

On April 7, 2008, Moses discharged Ms. DeWolfe and retained
Lamar Enzor, Esq. as defense counsel.  See Doc. 111 (Enzor notice
of substitution of counsel); Doc. 112 (DeWolfe response).  Mr.

---

[1] The motion to dismiss challenged the District of
Vermont's jury plan, alleging it systematically excluded African-
American jurors.  See Doc. 95.  Moses himself is Caucasian; he
did not articulate any particular reason why he felt prejudiced
by the alleged disparity in jury composition.

Enzor indicated the reason for the change was Moses's dissatisfaction with Ms. DeWolfe.  See Doc. 232 at 5-8 (transcript of May 6, 2008 hearing).  According to Mr. Enzor, Moses faulted Ms. DeWolfe for not communicating with him enough, and asked his family to seek out Mr. Enzor as retained counsel. Id.

On the same day, the Court issued a scheduling order setting the case for trial in June 2008, and noting any change of plea — in the event of a plea agreement — was to be completed in May 2008.  Doc. 113.  Mr. Enzor moved for a continuance, which was eventually granted, and trial was rescheduled for August 2008. In the meantime, the Court heard argument on the motion to dismiss, which was denied in a written order.  Doc. 166.

In June 2008, Mr. Enzor filed a Rule 12.3 notice of public authority defense, asserting Moses reasonably believed he was acting under the authority of federal and state law enforcement agencies.  Doc. 131 (sealed).  The government responded, denying Moses was acting under public authority.  Doc. 135.

Moses's criminal trial began on Wednesday, August 6, 2008, with three witnesses testifying for the government on the first day.  On the second day, six government witnesses testified — including several admitted drug dealers and users, who implicated Moses in the cocaine distribution conspiracy.  See Docs. 195, 198, 199, 200, 201, 202.  On the third day of trial, Friday

6

August 8, 2008, four more government witnesses presented similar testimony.  See Docs. 196, 197.  Various exhibits were also introduced into evidence during the first three days of trial, including bags of cocaine purchased in the course of the conspiracy, multiple firearms, audio recordings of conversations and telephone calls, maps, notes, photographs, and phone records. See Doc. 173.

On Monday, August 11, 2008, Jorge Burgos — the witness Moses was accused of attempting to kill — was scheduled to testify. Instead of proceeding with Burgos's testimony, however, Moses notified the Court that morning he intended to plead guilty to three of the charges under a plea agreement with the government. The Court conducted a full allocution and found Moses was of sound mind, his guilty pleas had a factual basis, he understood the effect and importance of pleading guilty, he was pleading guilty because he was in fact guilty, and he was making the decision to plead voluntarily and without coercion.  See Doc. 203 at 29.  Accordingly, the Court accepted Moses's guilty pleas and dismissed the jury.

Moses pled guilty to Counts 1, 6 and 12 of the Superseding Indictment.  In Count 1, Moses admitted to conspiring to distribute more than five kilograms of cocaine from approximately January 2002 until August 20, 2005.  In Count 6, Moses admitted to conspiring to possess a firearm during and in relation to a

drug trafficking crime, namely, the conspiracy to distribute cocaine.  In Count 12, he admitted to attempting to kill a witness, Jorge Burgos, to prevent him from testifying in the criminal proceeding.

After Moses's guilty plea, sentencing was set for December 2008.  Sentencing was postponed, however, as the forfeiture aspects of the case moved forward slowly.  Both parties filed memoranda, and the Court held an evidentiary hearing on June 1, 2009.  See Docs. 191, 192, 280.  By the fall of 2009, both parties had submitted proposed findings of fact, and the government moved for a preliminary order of forfeiture and for substitution of assets.  See Docs. 224, 226, 231.

On September 10, 2009, Mr. Enzor moved to withdraw as counsel for Moses, stating "[t]he attorney client relationship has completely broken down," and noting Moses had already filed a complaint against him with the Vermont Professional Conduct Board.  Doc. 229 at 1.  Moses, in filing a new CJA affidavit, complained that "none of [my attorneys] have done their best to help me."  Doc. 223 at 2 (sealed).  The Court granted Mr. Enzor's motion to withdraw on October 5, 2009, and at Moses's request, appointed Richard Bothfeld, Esq. as his fifth defense counsel. Doc. 234.

The District of Vermont Probation Office issued a draft presentence report (PSR) on November 19, 2009, finding the

applicable guideline sentence for Moses to be 30 years of imprisonment.  Mr. Bothfeld reviewed the PSR's contents with Moses and submitted written objections on December 21, 2009.  In the objections, Moses denied much of the criminal conduct he pled to, and stated the government's witnesses had lied at trial.

On January 5, 2010, Moses moved to withdraw his guilty plea. Doc. 237.  Mr. Bothfeld filed a one-page motion and Moses provided a lengthy supporting affidavit, detailing his arguments for withdrawing his plea.  Id.  The Court held a hearing on February 4, 2010, at which Mr. Enzor was called as a witness. See Doc. 261 (transcript).  Crystal Moses, the defendant's ex-wife, also testified briefly.  Because Moses indicated he wished to testify, the Court set a date to continue the hearing. However, Mr. Bothfeld then moved to withdraw as counsel for Moses.  Doc. 256.

In asking to withdraw, Mr. Bothfeld stated "irreconcilable differences exist, specifically regarding continued representation in Moses's pending Motion to Withdraw Guilty Plea."  Id. at 1.  Bothfeld also noted Moses wished to call him as a witness at the continuation of the motion hearing, which in itself created a conflict of interest.  Id.  The Court reserved ruling on the motion.

On May 6, 2010, the Court held a continuation of the hearing on Moses's motion to withdraw his guilty plea.  At that hearing,

9

the Court discussed with Moses his representation by counsel.
Moses indicated his unhappiness with Mr. Bothfeld arose from the
fact that Mr. Bothfeld did not agree with his strategy of
attempting to withdraw his plea, and Mr. Bothfeld advised Moses
against making certain arguments and presenting certain evidence
on the issue.  Doc. 264 at 3-5.  Moses, now on his fifth
attorney, stated there appeared to be no lawyer in the state of
Vermont who would do what he wanted.  Id. at 4.  The Court
accordingly allowed Moses to proceed pro se for the purposes of
his motion to withdraw guilty plea, with Mr. Bothfeld acting as
standby counsel.

Moses called three witnesses:  his ex-father-in-law Richard
Powers, his mother Janice Moses, and his ex-wife Crystal Moses.
See Doc. 264.  He also submitted affidavits from other individ-
uals and written argument on his own behalf.  See Doc. 263.
Following the hearing, Moses filed additional pro se memoranda in
support of his original motion, see Docs. 265, 266, 271, 273, as
well as a new motion to withdraw his plea on separate grounds,
Doc. 272.  Both motions are now before the Court.

II.  Legal Standard

Under Rule 11 of the Federal Rules of Criminal Procedure, a
criminal defendant may withdraw a plea of guilty prior to
sentencing if he can show "a fair and just reason" for doing so.

Fed. R. Cr. P. 11(d)(2)(B).[2]  Although "'this standard implies that motions to withdraw prior to sentence should be liberally granted,'" United States v. Doe, 537 F.3d 204, 210 (2d Cir. 2008) (quoting United States v. Gonzalez, 970 F.2d 1095, 1100 (2d Cir. 1992)), the Second Circuit has made clear that "'[a] defendant has no absolute right to withdraw his plea of guilty.'"  United States v. Rosen, 409 F.3d 535, 545 (2d Cir. 2005) (quoting United States v. Williams, 23 F.3d 629, 634 (2d Cir. 1994)). "'[S]ociety has a strong interest in the finality of guilty pleas, and allowing withdrawal of pleas not only undermines confidence in the integrity of our judicial procedures, but also increases the volume of judicial work, and delays and impairs the orderly administration of justice.'"  United States v. Schmidt, 373 F.3d 100, 103 (2d Cir. 2004) (quoting United States v. Maher, 108 F.3d 1513, 1529 (2d Cir. 1997)).  The decision whether or not to allow a defendant to withdraw his plea is accordingly "committed to the district court's discretion."  Rosen, 409 F.3d at 546.

On a motion to withdraw a guilty plea, "'[t]he defendant bears the burden of demonstrating valid grounds for relief.'"  United States v. Medina, 282 F. App'x 939, 941 (2d Cir. 2008) (summary order) (quoting United States v. Torres, 129 F.3d 710, 715 (2d Cir. 1997)).

---

[2] This provision was previously located in Rule 32.  For a thorough history of the legal standard for withdrawing pleas, see United States v. Rosen, 409 F.3d 535, 545 (2d Cir. 2005).

> To determine whether a defendant has met this burden, a court should consider: "(1) whether the defendant has asserted his or her legal innocence in the motion to withdraw the guilty plea; (2) the amount of time that has elapsed between the plea and the motion (the longer the elapsed time, the less likely withdrawal would be fair and just); and (3) whether the government would be prejudiced by a withdrawal of the plea."

United States v. Carreto, 583 F.3d 152, 157 (2d Cir. 2009) (quoting Schmidt, 373 F.3d at 102-03).

In addition to these three general considerations, courts must examine the specific contents of a defendant's motion. "Where a motion to withdraw a plea is premised on involuntariness, the 'defendant must raise a significant question about the voluntariness of the original plea,'" in order to withdraw the plea.  Doe, 537 F.3d at 211 (quoting Torres, 129 F.3d at 715).  "[W]ith regard to voluntariness, a guilty plea 'must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g., bribes).'"  Id. (quoting Brady v. United States, 397 U.S. 742, 755 (1970)).  Ineffective assistance of counsel can also render a guilty plea involuntary, as discussed in greater detail below.  See United States v. Couto, 311 F.3d 179, 187 (2d Cir. 2002), abrogated on other grounds by Padilla v. Kentucky, 130 S. Ct. 1473, 1484 (2010).

12

Courts often have to evaluate and weigh the facts, in resolving a motion to withdraw a guilty plea.  In doing so, "statements at a plea allocution carry a strong presumption of veracity," Doe, 537 F.3d at 213, and "'[a] defendant's bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea,'" id. at 211 (quoting Torres, 129 F.3d at 715). Furthermore, "when . . . the defendant has gone to trial, heard most of the government's evidence, and then pleaded guilty, describing his wrongdoing and acknowledging that he could not effectively defend against that evidence," the court, "in reviewing the belated claims of innocence, must draw all permissible inferences in favor of the government and against the defendant." Maher, 108 F.3d at 1530 (internal quotation omitted).

## III. Discussion

The Court first evaluates Moses's specific arguments for withdrawing his plea, then turns to the three general factors relevant to plea withdrawal.

### A.   Specific Grounds for Plea Withdrawal

Moses claims he was variously coerced and misled into pleading guilty, and accordingly urges this Court to find his

guilty plea invalid.  His pro se filings are rather jumbled, but the arguments can be classified as follows.[3]

### 1.   Involuntariness and Direct Coercion

"The broad test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'"  United States v. Tolson, 372 F. Supp. 2d 1, 10-11 (D.D.C. 2005) (quoting Hill v. Lockhart, 474 U.S. 52, 56 (1985)).  Moses repeatedly asserts his guilty plea was involuntary, raising three general types of "coercion."

### a.   Government Misconduct Creating a Bad Situation for Moses at Trial

Moses is convinced government agents and prosecutors committed misconduct in his case.  He alleges the government threatened and intimidated witnesses into either testifying against him or not testifying for him.  He also claims the government falsified or tampered with evidence, failed to turn over exculpatory and impeachment evidence, and put a "spy in

---

[3]  There is also one miscellaneous allegation, in which Moses claims his fourth attorney, Lamar Enzor, tricked him into firing his previous counsel and hiring Enzor.  See Doc. 237-1 ¶¶ 3, 5.  This allegation conflicts with statements by Mr. Enzor at the time, however, which indicate a breakdown of communication between Moses and his previous counsel as the reason for changing attorneys.  See Doc. 232 at 6-8 (transcript of May 6, 2008 hearing).  It also conflicts with testimony by Mr. Enzor at the February 4, 2010 hearing, which this Court finds credible. See Doc. 261 at 5 (noting dissatisfaction with Ms. DeWolfe as Moses's reason for changing attorneys).  More importantly, the question of why Moses hired Mr. Enzor is neither here nor there, with respect to the validity of his plea.

[the] defense camp." Doc. 266 at 1-2. Moses believes this alleged misconduct was to blame for the situation in which he found himself — three days into trial, facing damning evidence of his own guilt. According to Moses, at that point he had "no choice" but to plead guilty, so the resulting plea was involuntary.

As an initial matter, it is not clear whether pretrial misconduct is a cognizable basis for withdrawing a guilty plea. The issue on a motion to withdraw a plea, when the plea was taken mid-trial, is not whether a defendant's trial was going the best possible way it could have, but rather whether the defendant's choice to enter the guilty plea was made knowingly and voluntarily given the situation he was facing. See Doe, 537 F.3d at 212 ("The question is not whether [a defendant's] decision reflect[s] a wholly unrestrained will, but rather whether it constitute[s] a deliberate, intelligent choice between available alternatives." (internal quotation omitted)). But cf. Friedman v. Rehal, No. 08-0297, slip op. at 24-25 (2d Cir. Aug. 16, 2010) (suggesting flaws in pretrial proceedings and at trial might, in very extreme situations, produce a coerced plea, but also noting the factual situation at hand was truly singular). Phrased differently, pleading guilty and then withdrawing the plea is not the appropriate mechanism for challenging whether one's trial has been fair. Rather, defendants must proceed through trial and appeal the verdict.

Even assuming this kind of pretrial government misconduct could render a guilty plea coerced and involuntary, Moses falls well short of demonstrating it here.

In terms of witness intimidation, Moses claims Kelli Hoisington was asked to lie at his trial, and when she refused, was told to stay away from the trial or she would go to jail and lose her kids.  Doc. 237-1 ¶ 8; Doc. 266 ¶ 18.  Ms. Hoisington submitted a similar affidavit.  Ex. E at 2-5 (admitted at May 6, 2010 hearing).  When combed for actual facts, however, Ms. Hoisington's affidavit simply shows she was asked to say things as a witness that she did not agree with, and the government agent reminded her of the penalties for perjury.  Id. at 2.  Although she claims she "was le[d] to believe [she] would be arrested," and "was told [she] could not go near the trial," her affidavit is vague and leaves unclear where these beliefs came from, and what was actually said.  Id. at 3, 5.

Moses also points to Debra Grant as an intimidated witness.  Ms. Grant, in an affidavit, states government agents visited "the neighbors of the elderly man that [she] provided in home care for," and told them details of Moses's arrest, with the intent to embarrass her and to "alienate [Moses] from any[]one who could testify in his defense."  Ex. G at 1 (admitted at May 6, 2010 hearing).  While Ms. Grant makes clear she felt humiliated at being identified with Moses, her statement provides little from which to infer actual government misconduct.

16

Moses also claims Vicki Radicioni was intimidated by the government, offering a two-sentence affidavit in which she states, "My father . . . said [a government agent] told him that I should not testify on behalf of Richard Moses because I could lose my kids." Ex. I (admitted at May 6, 2010 hearing). This statement relies entirely on hearsay, which is particularly unreliable given the complex relationship between the Radicionis and Moses.

In another example, Moses alleges his ex-wife Crystal Moses was told her house and bank account would be confiscated unless she testified falsely to the grand jury to incriminate Moses. See Doc. 237-1 ¶ 13. Even if true, however, this is logically unrelated to Moses's decision to plead guilty at trial. The grand jury is an entirely separate phase of proceedings, and government misconduct before the grand jury would not support a claim of involuntariness in pleading guilty at trial.

Crystal Moses also testified at the February 4, 2010 hearing that she felt threatened during "conversations with supervisors at the [M]arshal's [S]ervice," but she gave no further details about what was said, or the nature of the alleged intimidation. Doc. 261 at 89. In any case, Crystal Moses was prepared to testify as a defense witness, id. at 90, so it is not clear that this alleged intimidation affected Moses's situation at trial.

Richard Powers, Crystal Moses's father, described a conversation with police in which they offered Crystal assistance

with a restraining order in exchange for her help gathering evidence against Moses.  Doc. 264 at 22-23.  The outcome of this offer is unclear, although it appears Crystal did not accept it.

Finally, Moses claims Annette Ruotolo was threatened with jail time if she testified for him.  Doc. 237-1 ¶ 10.  Moses provides an affidavit from Ms. Ruotolo, and unlike the other witnesses, Ms. Ruotolo alleges facts that could substantiate intimidation.  In particular, she describes a conversation with Trevor Carbo, a State Trooper working for the drug task force, in which she was explicitly threatened with retaliation for writing a statement on Moses's behalf.  Ex. H at 1 (admitted at May 6, 2010 hearing).  She further states that she was dissuaded from participating as a witness as a result of this conversation, and "wouldn't return any phone calls or anything."  Id.  Ms. Ruotolo's statements appear to conflict with a later affidavit, however, in which she says she spoke with defense counsel prior to trial and informed him of everything that had happened.  Id. at 3.  Ms. Ruotolo was also listed as a defense witness at trial, so it is uncertain to what extent Moses's situation at trial was affected by the intimidation.

Turning to Moses's allegations of government misconduct related to evidence, he claims "there were recordings that were altered."  Doc. 237-1 ¶ 4.  He also alleges "the government had recordings that would exonerate [him]," which were not turned over to the defense.  Id. ¶ 12.  Beyond these bald assertions, however,

Moses provides no specifics.  Mr. Enzor's testimony weighs against
these claims, as he stated he never received any information
confirming evidence tampering.  Doc. 261 at 70.  At the plea
allocution, Mr. Enzor also stated he was satisfied the government
had provided all the appropriate discovery materials, and Moses
was not pleading guilty due to illegally-obtained evidence in the
possession of the government.  Doc. 203 at 23.

Moses further alleges government agents fabricated a
statement attributed to Richard Powers in an affidavit supporting
a search warrant, and produced an inaccurate police report after
an interview with Powers in Lebanon, New Hampshire.  Powers
testified at the May evidentiary hearing on both these issues,
and provided a written affidavit as well.  See Ex. D (admitted
at May 6, 2010 hearing); Doc. 264 at 23-28.  The search warrant
affidavit was raised in a pretrial motion to suppress, however,
and the Court ruled it was not necessary for finding probable
cause.  See Doc. 96 at 3-4 (motion); Doc. 110 at 10 (ruling).
Accordingly, it is unclear what impact Moses believes the mis-
attribution of Mr. Powers's statements had on his situation at
trial.  The police report was not the subject of any pretrial
motions, but Moses provides no detail on the alleged inaccuracies
or how they affected his trial.

Finally, Moses vehemently protests what he refers to as a
"spy" being placed in his "defense camp."  Doc. 266 at 1-2.  Moses
is referring to the government inadvertently collecting

information relating to his legal representation in the drug case, while investigating the witness tampering charges.  As noted in the background section above, this issue was the subject of several sealed filings from the parties, and was more than adequately addressed by the government transferring the case to new prosecutors, "screening off" those attorneys, and instructing its cooperating witness and agents to not report on anything relating to Moses's legal case.  See Docs. 37, 82.

Overall, the Court finds Moses's allegations of government misconduct do not provide grounds for withdrawing his guilty plea. Many of the allegations are vague and unsubstantiated; given Moses's complete lack of credibility at this point, the Court accords these claims little weight.  Of the allegations for which Moses provides external evidence, some appear to fall within the bounds of a normal prosecution (e.g., reminding witnesses of the penalties for perjury; screening off attorneys from accidentally-discovered information).[4]  A very few of Moses's allegations could demonstrate actual government overreaching (e.g., Ms. Ruotolo's experience), but even those fail to demonstrate that Moses's situation at trial would have been different, had the alleged misconduct not occurred.  The simple fact is that Moses pled guilty after three days of highly inculpatory evidence, and the

---

[4]  This is not to deny some witnesses may have felt genuinely upset or scared; as Mr. Enzor notes, being involved in a criminal trial "[is] a difficult situation for anybody."  Doc. 261 at 28.

vast majority of this evidence was unrelated to the misconduct Moses alleges.  Even if the Court were to find Moses has demonstrated misconduct in a few instances (which it need not do, see Maher, 108 F.3d at 1530), any impact of this misconduct on the evidentiary weight faced by Moses at trial was minimal[5] and falls well short of demonstrating his plea was coerced by government misconduct.  See Doe, 537 F.3d at 211 (noting a defendant must "raise a significant question about the voluntariness of the original plea").

> b.  Explicit Pressure from Mr. Enzor to Accept the Plea Agreement

Moses argues, "Mr. Enzor coerced me to take the plea agreement offered mid-trial."  Doc. 237-1 ¶ 18.  According to Moses, Mr. Enzor exerted pressure on him to accept the plea agreement by telling him he "had minutes to take the plea or [he] would lose the case and spend the rest of [his] life underground in a supermax prison."  Id. ¶ 8.  Moses also alleges Mr. Enzor told him it was too late to raise issues of misconduct and nobody

---

[5]  The Court notes that aside from the search warrant affidavit and the inadvertently-collected information about Moses's legal defense, none of the alleged instances of misconduct appear to have been significant enough for any of Moses's five attorneys to bring to the Court's attention.  Also, as noted above, Mr. Enzor stated at the plea allocution he was satisfied the government had disclosed all appropriate evidence, and that Moses was not pleading guilty because of any illegally-obtained evidence in possession of the government.  Doc. 203 at 23.  The Court credits Mr. Enzor's testimony.  See Doe, 537 F.3d at 213.

would testify on his behalf, so he had to plead guilty.  Id. ¶ 8;
Doc. 273 at 2.

    To support this story of coercion, Moses points to the bench
conference transcripts from trial, which, he says, show an intent
by Mr. Enzor to coerce him into pleading guilty.  On Friday,
August 8, 2008, the Court inquired about the status of plea
negotiations, and the following exchange occurred:

>     MR. ENZOR:  [W]e got this offer late
> yesterday because Mr. Van de Graaf had to confer
> with Mr. Anderson, etcetera.  You know, quite
> frankly, you know, in terms of trial prep and the
> amount of time I've had to talk to him I have
> stressed it to him a lot, but I wouldn't say it's
> a lot of time getting him over some emotional
> hurdles.  It's not that much time.  And quite
> frankly just as a matter of the psychology of it,
> you know, he was offered a much better
> opportunity, you know, two years ago, etcetera.
> So getting over the degrees I should have taken
> those offers, you know, kind of a mental hurdle is
> part of this process.  And so I can't say I've
> had, you know, a lot of time to really pressure
> him or --
>     MR. VAN de GRAAF:  Do you think it's worth
> giving him til Monday?
>     MR. ENZOR:  I think it is.
>     MR. VAN de GRAAF:  . . . I don't want to be
> unreasonable if you thought you could continue to
> talk about it until Monday morning.
>     MR. ENZOR:  It will give me a better chance
> to leverage.
>     THE COURT:  Don't get yourself fired.
>     MR. ENZOR:  I will not do that. I wouldn't do
> that.

Doc. 239 at 10-11.

    Mr. Enzor testified at the February hearing, however, and
explained he in fact did not coerce Moses into pleading guilty.
Rather, he "described to [Moses] the benefits of the offer, what

was being dismissed, what he would be pleading to, all of that."
Doc. 261 at 19; accord id. at 16.  Mr. Enzor testified at length,
describing a series of conversations with Moses over several days
in which Moses initially expressed little interest in pleading,
but eventually agreed to see the agreement in writing.  Id. at
14-23.  Mr. Enzor and Moses sat down on Monday, August 11, 2008,
to discuss the written plea agreement.  According to Mr. Enzor,
Moses read the agreement and they went over it point by point,
then discussed broader aspects of Moses's case — including
difficulties they were having in locating certain witnesses, the
possibility of raising misconduct issues at sentencing, what
could be expected in terms of sentencing, and so on.  Id. at
27-33.  Mr. Enzor says he "reiterated all the benefits of having
charges dismissed, [and] of having the life enhancement
dismissed," and Moses eventually changed his mind and decided to
plead guilty.[6]  Id. at 35.

     As a factual matter, the Court finds Mr. Enzor's testimony
credible.  Mr. Enzor was an experienced criminal defense
attorney.  Although his statements at the bench contained some
strong terms (such as "pressure" and "leverage"), the Court finds

---

     [6] At the February hearing, Moses's new counsel established
that Moses had rejected prior plea agreements and had not
appeared interested in a plea deal in the past, see, e.g.,
Doc. 261 at 86, with the implication that an external force like
pressure from Mr. Enzor must have been responsible for his
decision to reverse course.  This does not necessarily follow,
however, since Moses's change of heart is explained far better by
his realizing the jury would likely find him guilty.

Mr. Enzor was simply communicating to opposing counsel and the Court that he believed the plea was a good idea and intended to advise Moses of that.[7]

As a legal matter, the Court notes that a "defense counsel's blunt rendering of an honest but negative assessment of [a defendant's] chances at trial, combined with advice to enter the plea, [does not] constitute improper behavior or coercion that would suffice to invalidate a plea." United States v. Juncal, 245 F.3d 166, 172 (2d Cir. 2001). "It is . . . commonplace that a defendant will feel coerced in the lay sense of the word by an attorney's recommendation to plead guilty rather than proceed to trial. Such recommendations often come with predictions of almost inevitable conviction at trial followed by a long jail sentence." Id. at 174. Here, if convicted, Moses was possibly facing mandatory life imprisonment without parole. See Doc. 238 at 2. "A feeling of duress is hardly an unusual outcome of such deliberations." Juncal, 245 F.3d at 174. In contrast, a plea will be invalidated based on coercion when a defendant is "incapable of rationally assessing his options," due to "physical threats, economic incentives, or mental pressures." United

---

[7]   Moreover, the Court's admonition to not "get fired" was an extra reminder for Mr. Enzor of the need to not exert undue pressure when advising his client.  Moses interprets the Court's comment as indicating some kind of illicit activity, but rather, it was a reflection of the fact that Moses was already on his fourth attorney, he was not likely to enjoy considering a guilty plea, and Mr. Enzor needed to pay attention as he advised Moses, as Moses might become angry and demand yet another lawyer.

States v. Davis, 48 F. App'x 809, 812 (2d Cir. 2002) (summary order).

Here, the Court finds Moses's version of the story is exaggerated, and Mr. Enzor was "doing nothing more than vigorously urging [Moses] to accept a plea agreement in a case that, in his legal opinion, was hopeless." Id. The evidence presented at trial was strongly inculpatory, so it was a realistic assessment of the situation for Mr. Enzor to recommend a plea. See Doc. 266 at 4 (noting at least two of Moses's previous attorneys had also encouraged him to plead guilty). Moses's story of coercion is also undercut by his statements at the plea allocution, where he denied he was pleading guilty as a result of threats, Doc. 203 at 22-23, and stated he was satisfied by Mr. Enzor's representation and advice, id. at 25. Sworn statements at a plea allocution are entitled to a strong presumption of veracity, Doe, 537 F.3d at 213, so the Court gives weight to these representations. See also Tolson, 372 F. Supp. 2d at 22 (noting plea allocutions provide "ample opportunity to notify the Court" of coercion).

Moses may well have felt "frightened, pressured, and under duress" when he realized a guilty plea was his best option, but this does not invalidate the plea. Juncal, 245 F.3d at 173 (internal quotation marks omitted). As the Second Circuit has noted, "[t]here is no legal requirement that the decision to plead guilty be an easy one." Doe, 537 F.3d at 213.

25

c.   Desire to Protect Family and
     Friends from Government Intimidation

Moses challenges the voluntariness of his plea in a third

way, arguing he pled guilty not because he was actually guilty,

but rather to end government harassment of his friends and

family.  As discussed above, Moses believed the government was

intimidating and threatening his witnesses (who were largely his

friends and family), and to some degree the witnesses shared this

view.  Moses describes further harassment in an anecdote of

police "g[etting] real rough with" his son, after a traffic

accident.  Doc. 237-1 ¶ 16.  This harassment exerted a coercive

force, according to Moses, and made his guilty plea involuntary.

See id. ¶¶ 16-18.

Moses's plea allocution appears to undercut this argument,

as he stated under oath there were no "threats made against . . .

members of [his] family or anyone else close to [him] that [we]re

forcing [him] or compelling [him] to plead guilty."  Doc. 203 at

22-23.  This would ordinarily end the inquiry, as statements at a

plea allocution are entitled to a strong presumption of veracity,

Doe, 537 F.3d at 213, but Moses successfully calls into question

his understanding of this portion of his allocution.  The record

reflects Moses conferring with Mr. Enzor after the Court asked

him this question, Doc. 203 at 23, and at the February hearing,

Mr. Enzor testified that he advised Moses the question only

referred to threats against him personally, not others.  Doc. 261

at 39.  Because Moses could have misunderstood the question as
referring only to himself, the Court will discount his statement
at the allocation.

Even without relying on the allocation, however, Moses's
argument fails.  Moses believed his witnesses were being harassed
and intimidated through the entire pre-trial period, yet he
showed no interest in saving them by pleading guilty.  See, e.g.,
Doc. 261 at 86 (noting Moses's lack of interest in a plea leading
up to trial).  Only well into his trial, after facing three days
of evidence against him, did Moses plead guilty.  The Court
simply cannot believe Moses's story that he was suddenly
motivated by a desire to spare his friends and family from
harassment, with only a week or two remaining before resolution
of his case.  See United States v. Grzybek, 283 F. App'x 843,
845-46 (2d Cir. 2008) (summary order) (holding the defendant's
belief that his family was being mistreated, absent more, was an
"insufficient basis to determine that his plea was involuntary").

### 2.   Ineffective Assistance of Counsel

Aside from direct coercion, the second main way Moses
challenges his guilty plea is by asserting Mr. Enzor provided
ineffective assistance of counsel.  "An accused who has not
received reasonably effective assistance from counsel in deciding
to plead guilty cannot be bound by that plea because a plea of
guilty is valid only if made intelligently and voluntarily."
Couto, 311 F.3d at 187 (internal quotation omitted).  Moses

raises various arguments relating to Mr. Enzor's effectiveness as counsel, which can be classified as follows.

a.   Poor Representation by Mr. Enzor Putting Moses in a Bad Situation at Trial

Moses lists numerous perceived deficiencies in Mr. Enzor's representation, such as failing to analyze and challenge certain evidence, id. ¶ 4, failing to return phone calls, id., refusing to file motions on Moses's behalf, id. ¶ 5, not investigating government witnesses before trial, id. ¶¶ 6, 9, not tracking down defense witnesses, id. ¶¶ 7, 22, failing to present certain evidence, id. ¶¶ 7, 12, declining to argue certain legal theories like entrapment, id. ¶ 6, conducting poor cross-examination, id. ¶ 7, and being generally unprepared for trial, id.

Had Moses continued with his trial and been convicted, these complaints would be properly reviewable via a Sixth Amendment ineffective assistance of counsel claim in a subsequent § 2255 motion.  Given that Moses truncated the trial and pled guilty, however, his complaints about Mr. Enzor's representation during prior phases of his case are generally not reviewable on a motion to withdraw guilty plea.  See Torres, 129 F.3d at 715-16 ("A defendant who pleads guilty unconditionally while represented by counsel may not assert independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.  Rather, a defendant may only attack the voluntary and intelligent character of the guilty plea by

28

showing that the advice he received from counsel [during the plea process] was not within acceptable standards." (internal quotation, citation, and alteration omitted)).

Despite this general rule, the case law occasionally suggests that a defendant can raise pre-plea attorney incompetence in a slightly different way — by claiming he decided to plead guilty out of fear his counsel was unprepared to go to trial.  See, e.g., id. at 716 (reviewing this type of claim and treating it more as an involuntariness issue than a Strickland-type ineffective assistance claim).  Because Moses phrases his concerns in this way, Doc. 237-1 ¶ 19 ("I took the plea offer because I did not have confidence that Mr. Enzor was prepared to properly represent me at trial or to present a defense on my behalf."), the Court will address them out of an abundance of caution.

Even when examined on the merits, however, Moses's complaints fail to show inadequate representation by Mr. Enzor sufficient to render Moses's guilty plea involuntary.  First, Mr. Enzor testified credibly that he had worked on Moses's case, including investigating witnesses and dealing with evidence.  See Doc. 261 at 8, 23-24, 70.  Second, many of Moses's complaints deal with Mr. Enzor's trial strategy, such as cross-examination, decisions to call or not call witnesses, and what evidence to pursue.  These strategy decisions are not subject to judicial second-guessing.  See United States v. Walker, 24 F. App'x 57,

60 (2d Cir. 2001) (summary order); <u>United States v. DeJesus</u>,
57 F. App'x 474, 478 (2d Cir. 2003) (summary order) ("Because of
[its] inherently tactical nature, the decision not to call a
particular witness generally should not be disturbed."); <u>see also</u>
<u>Juncal</u>, 245 F.3d at 173-74 ("It is . . . typical that a defendant
will disagree with defense counsel over whether to call certain
witnesses, with the defendant seeing only an upside while counsel
must anticipate the dangers of facial implausibility and/or
damaging cross-examination."). Third, and most importantly, at
his plea allocution Moses specifically stated — under oath — that
he was satisfied with Mr. Enzor's representation and advice.
Doc. 203 at 25. The Court credits Moses's statements from his
plea allocution over his later claims to the contrary. <u>Doe</u>,
537 F.3d at 213. Accordingly, the Court concludes Moses's
complaints about Mr. Enzor's pre-plea representation fail to
provide grounds for withdrawing his plea. <u>See</u> <u>Torres</u>, 129 F.3d
at 716.

   b.  <u>Inadequate Representation During the Plea</u>
      <u>Proceeding Itself</u>

  Moses also challenges Mr. Enzor's representation during the
plea proceeding. He alleges Mr. Enzor misrepresented what would
happen after pleading guilty, by telling him the Court would
ultimately reject the plea agreement and dismiss the charges.
Doc. 237-1 ¶¶ 8, 16-17, 19; Doc. 248 ¶¶ 2-4. According to Moses:

    The reason I decided to change my plea to guilty
   and to sign the plea agreement was because Mr. Enzor

advised me the judge would not give me a 20 year
sentence, that he (Enzor) would file affidavits of our
witnesses with the court before sentencing that would
convince the judge of the government misconduct in the
case and that the judge would reject my guilty plea and
let me go home.

Doc. 248 at ¶ 3.

"Ineffective assistance of counsel during plea negotiations

can invalidate a guilty plea and make granting withdrawal

appropriate, to the extent that the counsel's deficient

performance undermines the voluntary and intelligent nature of

[the] defendant's decision to plead guilty."  <u>United States v.

Arteca</u>, 411 F.3d 315, 320 (2d Cir. 2005).  In general,

> We evaluate [a] claim that [the defendant's] guilty
> plea was involuntary or unknowing due to ineffective
> assistance of counsel using the framework established
> in <u>Strickland v. Washington</u>, 466 U.S. 668 [](1984).
> A defendant must first establish that counsel's
> representation fell below an objective standard of
> reasonableness.  Second, the defendant must show that
> there is a reasonable probability that, but for
> counsel's errors, [the defendant] would not have
> pleaded guilty and would have insisted on going to
> trial.

<u>Cuoto</u>, 311 F.3d at 187 (internal quotations and citations

omitted, final alteration in original).  In terms of the first

prong, "Where . . . [a] defendant's specific claim is that

counsel has misled him as to the possible sentence which might

result from a plea of guilty, . . . the issue is whether the

defendant was aware of actual sentencing possibilities."  <u>Arteca</u>,

411 F.3d at 320.

Moses's ineffective assistance claim fails on the first prong. Mr. Enzor credibly testified that he advised Moses "the plea agreement provided for a specific sentencing range," namely 20-25 years. Doc. 261 at 29. He discussed with Moses various scenarios that may occur after a defendant enters a guilty plea — including the Court rejecting the plea agreement — but states he made no promises about any of them. Id. at 30-31. In the discussions Mr. Enzor acknowledged Moses was concerned about government misconduct, and he explained that evidence on misconduct could be presented at sentencing, although Moses would be "walking a fine line" in terms of acceptance of responsibility. Id. Throughout, Mr. Enzor may have highlighted the positive outcomes slightly, but he testified he ultimately "made it clear . . . that [Moses] was signing up for a sentencing range of 20-25 years." Id. at 33; see generally id. at 29-37, 54-55. The Court credits Mr. Enzor's balanced description of the discussions over Moses's self-serving account.

The plea allocution provides further support for the conclusion that Mr. Enzor effectively counseled Moses. In particular, Moses stated under oath that nobody had promised him leniency if he pleaded guilty. Doc. 203 at 23. He also stated he understood "all that will be left in [this] case once [the Court] accept[s] [the] plea will be the imposition of a sentence . . . which, in [this] case, is going to result in imprisonment." Id. Both of these statements tend to undercut Moses's later

32

story of believing the case would be dismissed after he pled guilty. See Doe, 537 F.3d at 211, 213; Gonzalez, 970 F.2d at 1100-01 ("At the plea allocution, Gonzalez also stated unequivocally that he had read the cooperation agreement and was familiar with its content, and that no other offers had been made to him to induce his plea. Thus the District Court could properly reject Gonzalez' unsupported allegations that his plea was the result of reliance on his attorney's incorrect characterization of the agreement . . . .").

Overall, Mr. Enzor's counseling sufficed to make Moses "aware of actual sentencing possibilities," Arteca, 411 F.3d at 320, and did not fall below an objective level of reasonableness, Strickland, 466 U.S. 668.

### c.   Conflict of Interest

"An attorney has an actual . . . conflict of interest when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action." Lopez v. Scully, 58 F.3d 38, 41 (2d Cir. 1995) (internal quotations omitted). Certain portions of Moses's pro se filings could be viewed as arguing a conflict of interest existed when Mr. Enzor continued to represent him during the pendency of the Professional Conduct Board complaint. See, e.g., Doc. 265 at 3. The ethical complaint post-dates Moses's guilty plea, however, so any

33

conflict of interest would not be relevant to the voluntariness of his guilty plea.  See Torres, 129 F.3d at 715-16 .

> 3.   Court Involvement in the Plea Process

Having exhausted his arguments against the government and his own lawyer, Moses levels his final accusation against the Court.  His plea was involuntary, he claims, because the Court was impermissibly involved in the plea process.

Rule 11 provides:  "An attorney for the government and the defendant's attorney . . . may discuss and reach a plea agreement.  The court must not participate in these discussions." Fed. R. Cr. P. 11(c)(1).  Case law on Rule 11(c)(1) is relatively sparse,[8] but "the federal courts as a whole have established a familiar and generally uniform standard."  United States v. Baker, 489 F.3d 366, 370 (D.C. Cir. 2007).  It is widely agreed that the purpose of Rule 11(c)(1) is threefold:  to "minimize[] the risk that the defendant will be judicially coerced into pleading guilty, [to] preserve[] the impartiality of the court, and [to] avoid[] any appearance of impropriety."  United States v. Cano-Varela, 497 F.3d 1122, 1132 (10th Cir. 2007) (internal quotation omitted).

---

[8]   The only Second Circuit decision with any significant discussion of Rule 11(c)(1) appears to be United States v. Werker, 535 F.2d 198 (2d Cir. 1976).  Few district courts have applied Werker, however, perhaps due to its rather singular factual circumstances, which involved the defendant attempting to plea bargain directly with the court.

In applying Rule 11(c)(1), appellate courts occasionally make sweeping pronouncements suggesting Rule 11(c)(1) creates an absolute ban on any mention of a plea agreement by a district court.[9]  See, e.g., United States v. Barrett, 982 F.2d 193, 194-95 (6th Cir. 1992); United States v. Bruce, 976 F.2d 552, 555-58 (9th Cir. 1992); United States v. Werker, 535 F.2d 198, 201-03 (2d Cir. 1976).  The case law surveyed more broadly, however, makes clear that Rule 11(c)(1) situations are highly fact-dependent, and "the language of [prior cases] should not be quoted out of context."  United States v. Frank, 36 F.3d 898, 901 (9th Cir. 1994).  Applied otherwise, Rule 11(c)(1) would simply "establish a series of traps for imperfectly articulated oral remarks."  Cano-Varela, 497 F.3d at 1133 (internal quotation omitted).  Thus Rule 11(c)(1) situations must be analyzed in terms of the purposes of the rule, and not with illogical rigidity.  See id. at 1133-34; Frank, 36 F.3d at 902.

Moses complains the Court violated Rule 11(c)(1) in making certain comments at sidebar conferences with counsel on the

---

[9] Moses latches onto some of these quotations, repeating them frequently in his filings.  The Ninth Circuit acknowledged this tendency among litigants, in observing that a particular one of its precedents "has some language which is frequently quoted out of context in Rule 11(e)(1) 'participation' arguments."  United States v. Andrade-Larrios, 39 F.3d 986, 990 (9th Cir. 1993).  The court continued, reminding litigants that "[t]he holding of a case is not the same thing as a quotation from a case.  The holding is the proposition of law which requires that the particular facts in that case produce the result."  Id.

second and third days of his trial.  In particular, on August 7,
2008, the following exchange occurred:

>        THE COURT:  What is he facing here?
>        MR ENZOR:  Facing?
>        THE COURT:  If he gets convicted.
>        MR ENZOR:  I think he's facing up to life without
>    parole.
>        THE COURT:  Mandatory or just --
>        MR. VAN de GRAAF:  There is a legal issue about
>    whether it is, but it's possibly mandatory life because
>    of the two prior convictions.  And we filed a notice of
>    the two prior convictions.
>        MR ENZOR:  Right.
>        THE COURT:  So he knows that?
>        MR ENZOR:  He does. . . .

Doc. 238 at 2.  The attorneys proceeded to describe the status of

plea negotiations, which had stalled out after an offer lapsed as

Moses was changing attorneys for the third time.  Mr. Van de

Graaf, the prosecutor, volunteered "I've always been open to

resolution."  Id. at 3.  Mr. Enzor noted Moses did not appear to

be interested in a plea agreement previously, but it "was

probably not taken seriously . . . given the circumstances."  Id.

The Court then asked Mr. Enzor whether or not Moses was even

aware of the government's last offer:

>    THE COURT:  Well, the government hasn't expressly said
>    it, but if they were to offer a plea of a mandatory
>    15 years, I don't know if that would be 11(c)(1)(C) or
>    just a plea to whatever, he knows that or he doesn't
>    know that if the government were to do that?

Id. at 4.  Mr. Enzor confirmed the Court was referring to the

government's last offer:  "The mandatory 15 instead of life?"

Id.  The Court responded affirmatively, and Mr. Enzor asked

whether that offer allowed any flexibility for the court at

36

sentencing:  "And [] Your Honor could do something less if
necessary?"  Id.  As Mr. Van de Graaf had just indicated the plea
offer was for a mandatory fifteen years, the Court observed:  "I
don't think I could do anything less if it's a mandatory 15.
. . . [I]f it's a mandatory sentence it would have to be 15
years."  Id.  Mr. Enzor then indicated he would speak with Moses,
to see if he was aware of the offer.  Id.  He also asked Mr. Van
de Graaf if the government's offer was still pending, or could be
re-extended, and Mr. Van de Graaf tentatively indicated it was,
or at least some form of deal was possible.  Id. at 4-5.  Mr. Van
de Graaf said he was not sure if the same terms were still
available, but if Mr. Enzor spoke with Moses and found he would
seriously consider something resembling the original offer,
Mr. Van de Graaf would "consider whether . . . I'll take that."
Id. at 6.  In response to the parties' apparent confusion about
what offer was on the table, the Court said to Mr. Enzor, "I
think you better talk with him about whether he would accept the
agreement that was originally proposed."  Id.  The Court
continued, "If he's not willing to do that, fine.  But I think
the way this trial is going he's got some problems.  If other
witnesses are going to testify in a similar manner to the
witnesses I've seen so far you've got some real problems here."
Id.  Finally, because the government had filed a § 851
information with two prior drug felonies, the Court noted the
mandatory life sentence that would be required:  "[Y]ou know,

37

15 years is a lot of years or 16 years or whatever.  But life is, that's, as you know, many years." Id.  Mr. Enzor agreed, and stated his intention to speak with Moses about plea possibilities.  Id.

The following day, Friday, August 8, 2008, the Court called the attorneys up to the bench for a conference, after the day's testimony was mostly over:

> THE COURT:  You've been going along pretty quickly so do you have a estimate of how much longer you think your case is going to be?
> MR. VAN de GRAAF:  I would think we will be done on Tuesday at the end of the day probably, hopefully. We have one witness who is unavailable until Wednesday. . . . Besides that we should be done on Tuesday.
> THE COURT:  All right.  And you have any idea how long your case is going to be?  I'm just trying to give the jury an idea plus trying to figure out my schedule.
> MR. ENZOR:  Right.  Right.  If we're able to start sometime -- and I take it that testimony from Mr. Doud won't take very long?
> MR. VAN de GRAAF:  No.  We'd rest.  I mean assuming this plan is the way things are going right now we could be done at 9:30 on Wednesday.
> MR. ENZOR:  On Wednesday, right.  Okay. If we get started early Wednesday I think we could be done by Friday.
> THE COURT:  Okay.
> . . .
> THE COURT:  So Monday and maybe Tuesday.  I think probably I would say we'd be done by Tuesday. Although, I'm not going to tell them that I guess.  I thought you'd be able to finish everything by next week so I could give them some nice news.  But it looks like we'll probably go into the following week then.
> MR. VAN de GRAAF:  I mean, yeah. . . . [M]any of these defense witnesses I still hadn't gotten addresses for. . . .
> MR. ENZOR:  I've had trouble tracking people down so that's been my challenge.
> THE COURT:  Right.  Okay.  I won't tell them anything then.  I'll just ask them to come back on Monday and we'll go at it again.

            MR. ENZOR:  Okay.
            THE COURT:  Any further discussions about a plea
    or not?
            MR. ENZOR:  A lot of discussions um, and Mr. Van
    de Graaf's firm on his offer, which is understandable.
    But a lot of discussions with my client but no
    movement.
            THE COURT:  So what have you offered him?
            MR. VAN de GRAAF:  I offered two alternatives.  I
    offered -- well, one of the things that Mr. Moses was
    saying he didn't want to look at a really high number.
    I said I'd come down on my cap and I wanted him to go
    up on the bottom.  So I said I'd agree to 20 to 25, the
    Court can chose between 20 to 25 or I'd give him 22
    straight up with no taking discretion away from Your
    Honor.  And neither of those was even acceptable.
            THE COURT:  And you passed those on to him?
            MR. ENZOR:  I have.
            THE COURT:  Okay.  Just make sure you do.
            MR. ENZOR:  And I have in great detail.
            THE COURT:  All right.  You might want to get it
    in writing.
            MR. ENZOR:  Okay.  I understand, yeah.
            THE COURT:  Okay.  It doesn't look like we're
    going to resolve it.

Doc. 239 at 6-9.  Mr. Van de Graaf then noted his offer was

expiring that day, to which Mr. Enzor responded he had not had

enough time to work through some sticking points with Moses.

Id. at 9-10.  Mr. Van de Graaf asked, "Do you think it's worth

giving him [un]til Monday?", and Mr. Enzor replied, "I think it

is."  Id. at 10.  After a few more comments by the attorneys, the

Court indicated the bench conference was over:  "Okay.  So, fine.

We'll just leave it open then until Monday morning.  But

otherwise we'll go at it starting at 9:00 on Monday."  Id. at 11.

     Viewing these conversations in light of the purposes of Rule

11(c)(1), three issues are relevant.  First, courts must avoid

pressuring the parties to use particular terms in their plea

agreements.  United States v. Andrade-Larrios, 39 F.3d 986, 989 (9th Cir. 1994).  Second, courts must avoid giving any signal as to what sentence will be imposed on the defendant.  Bruce, 976 F.2d at 556.  Third, courts must avoid the appearance that the judge wants a plea agreement to be reached.  See Barrett, 982 F.2d at 194.

There was clearly no pressure to settle the case on particular terms here, as the Court never gave any indication of what terms it would consider preferable.  The only time the Court mentioned specific terms was in reminding Mr. Enzor the government's last offer was 15 years, but the terms of that offer were not of the Court's own initiation.  Moreover, that reminder did not serve to — and was not intended to — entrench those particular terms in the parties' minds, as the terms finally agreed upon by the parties were different.  Cf. Cruz v. United States, No. S11 94 CR 313, 2000 WL 1510079, at *4 (S.D.N.Y. Oct. 10, 2000) (noting a comment by the court did not exert impermissible pressure on the parties to settle the case on certain terms, as "the very suggestion the Court made was rejected by the parties").  The transcripts reveal the substantive discussions were carried forward entirely by the parties; the Court simply inquired as to what sentence Moses was facing, and came nowhere close to "shaping the plea bargain or persuading the defendant to accept particular terms."  Frank, 36 F.3d at 902.

Similarly, Moses was not coerced by the Court revealing what sentence he would receive.  Case law makes clear this concern arises when judges project the sentences they intend to give, ex ante, in situations where they have sentencing discretion.  See, e.g., Barrett, 982 F.2d at 194 (finding coercion violating Rule 11(c)(1) when district judge stated, prior to trial, he intended to exceed the guidelines).  Here, the only time the Court discussed potential sentences, they were nondiscretionary — the mandatory 15-year sentence in the government's original plea offer, and the mandatory life sentence due to the § 851 information.  Thus, when the Court discussed the 15-year sentence in response to Mr. Enzor's question, and later mentioned the life sentence, the Court was simply making observations based on applicable law; the Court was not revealing what it intended to do in a discretionary situation.  These discussions accordingly did not violate Rule 11(c)(1).

Finally, the Court did not impermissibly pressure the parties to reach a plea agreement.  The Court simply inquired as to what sentence Moses was facing, and the attorneys of their own initiative proceeded to discuss the status of plea negotiations.  On learning that Mr. Enzor had taken over the case at a time when a plea offer was pending, but did not appear aware of the offer, the Court reminded him — as a matter of adequate representation — to be sure Moses knew of that offer.  While the Court may have

41

been concerned about Moses facing a life sentence,[10] the case law
makes clear that any such good intentions by the Court are
irrelevant, and Rule 11(c)(1) analyses are to be based on the
objective facts.  See Cano-Varela, 497 F.3d at 1133-34; Baker,
489 F.3d at 376; Bruce, 976 F.2d at 559.

The Court was primarily ensuring the parties were
communicating with each other,[11] see, e.g., Doc. 239 at 9 ("And
you passed those [offers] on to him? . . . Just make sure you
do."), and keeping tabs on what negotiations were occurring and
what Moses's knowledge and interest level was, see, e.g., Doc.
238 at 4 ("[H]e knows that or he doesn't know that . . . ?").
This type of involvement does not violate Rule 11(c)(1).  See
Frank, 36 F.3d at 903; Fama v. United States, 901 F.2d 1175, 1179
(2d Cir. 1990); United States v. Uribe-Londono, 409 F.3d 1, 4
(1st Cir. 2005) (finding no violation where district court
inquired about the status of plea negotiations, and instructed
one party to "look at it again . . . from the standpoint of a
potential disposition").  Moreover, the Court's inquiry about
plea negotiations on August 8, 2008 was clearly in the context of

---

[10]   Indeed, at a hearing two years later, the Court
acknowledged as much.  See Doc. 264 at 70.

[11]   One of the comments seized upon by Moses, where the
Court recommends Mr. Enzor get the offer in writing, see Doc. 239
at 9, was of this nature — simply intended to facilitate
communication.  Plea agreements are often complex, and the Court
was reminding Mr. Enzor of best practices for plea negotiations.
This advice was particularly appropriate, given Moses's history
of firing lawyers and accusing them of incompetence.

42

scheduling the upcoming weeks of trial, and such inquiries do not violate the rule.  See Cano-Varela, 497 F.3d at 1132 ("Rule 11(c)(1) is not violated by a judge's comments made while implementing or planning docket or case-management decisions.").

Although the Court noted the significance of life imprisonment on August 7, 2008, see Doc. 238 at 6, and mentioned the evidence had not been favorable to Moses thus far, id., these references were made only in passing, and the Court was speaking only to the attorneys.  See United States v. Bierd, 217 F.3d 15, 21 (1st Cir. 2000) (finding significant that the district court's comments were made only to attorneys).  The Court also made clear the decision of whether to settle or continue with trial was up to the parties, and the Court was happy to continue with trial. See, e.g., Doc. 239 at 9 ("Okay.  It doesn't look like we're going to resolve it."); id. at 11 ("So fine. . . . [W]e'll go at it starting at 9:00 on Monday."); see also Uribe-Londono, 409 F.3d at 4 ("[P]erhaps most importantly, the [Court] made clear to counsel that the trial process would continue and that whether any plea negotiations occurred was up to the parties' discretion."); Bierd, 217 F.3d at 21.

Overall, the Court's comments were largely made "in a procedural, supervisory role," which is permissible under Rule 11(c)(1).  Fama, 901 F.2d at 1179; accord Gonzalez v. United States, No. 97-CV-1903, 2000 WL 297721, at *8 (E.D.N.Y. Mar. 9, 2000); Sheedy v. United States, No. 96-CV-1289, 1997 WL 394664,

at *6 (N.D.N.Y. July 8, 1997).  The Court "did not threaten
anything if [Moses] did not plead, or promise anything if he
did," <u>Frank</u>, 36 F.3d at 903, and the Court "neither suggested
terms for a plea that it would be inclined to accept nor
otherwise interfered with subsequent plea negotiations," <u>United
States v. Penev</u>, 362 F. App'x 170, 174 (2d Cir. 2010) (summary
order).  Despite Moses's protestations, the facts here simply do
not rise to the level of a Rule 11(c)(1) violation.  <u>Cf.</u> <u>Bruce</u>,
976 F.2d at 555 (finding violation where district court,
addressing defendants directly, repeatedly underscored the
maximum penalty they were facing, describing it as "very, very
heavy," and instructed defendants to "think carefully about that
tonight"); <u>Baker</u>, 489 F.3d at 368-69 (finding violation where
district court repeatedly referenced a previous case in which a
defendant had pled, noted the sentence he had given in that case,
and stated he would try to "be consistent" with that sentence in
the instant case); <u>Cano-Varela</u>, 497 F.3d at 1128-29 (finding
violation where district court, addressing defendant directly,
predicted his sentence in the event of a conviction would be
"harsh," told him he would get a "much better, much lesser
sentence" if he pled, and asked him to "carefully consider [his]
options"); <u>Barrett</u>, 982 F.2d at 194 (finding violation where
district court arranged pre-trial conference call at which he
said "there is no way on God's green Earth I'm going to sentence
him to only seven years, and I think the likelihood is I'm going

44

to exceed the guidelines," and told defense counsel "I truly
don't see what defense he has").

The Court finds no violation of Rule 11(c)(1) occurred
during the bench conferences on August 7 and 8, 2008, and
accordingly Moses's guilty plea was not rendered involuntary.

B.   <u>General Considerations for Withdrawing a Guilty Plea</u>

Having addressed the specific contents of Moses's motions,
the Court now turns to the three general factors relevant to a
plea withdrawal.

1.   <u>Actual Innocence</u>

The first factor asks whether Moses has asserted a claim of
legal innocence.  <u>Carreto</u>, 583 F.3d at 157.  Here, Moses has
raised a claim of innocence, but it is a bald assertion.  <u>See,
e.g.</u>, Doc. 237-1 ¶¶ 2, 19.  Weighing against this claim is three
days of evidence at Moses's trial, as well as his statements
under oath at the plea allocution — where he admitted both his
guilt and the factual basis for the offenses.  Doc. 203 at 13,
27-28.  The Court accordingly gives Moses's assertion of
innocence little credit.  <u>See</u> <u>Doe</u>, 537 F.3d at 213; <u>Maher</u>,
108 F.3d at 1531 (noting district courts, who have "the
opportunity to observe [defendants'] demeanor and assess their
credibility, [are] plainly entitled to reject [defendants']
belated claims of innocence that contradict[] their credible
pleas of guilt").

Rather than credibly asserting his actual innocence, Moses self-righteously attacks minor flaws and issues in his prosecution.  See, e.g., Doc. 266 (presenting a litany of perceived rights violations, while sidestepping the substance of his case).  This appears to be a continuation of Moses's pattern of blaming others and creating stories, to avoid accepting responsibility for his actions.

2.   Length of Time Elapsed

The second factor looks to how much time has elapsed between the guilty plea and the defendant's motion to withdraw his plea.  Carreto, 583 F.3d at 157.  Here, nearly seventeen months passed between Moses's guilty plea and his motion to withdraw the plea.  To suggest the actual time elapsed was shorter, Moses submits a letter he allegedly wrote to Mr. Enzor on August 20, 2008 — nine days after the plea — saying he wished to withdraw his plea.  Ex. B (admitted at February 4, 2010 hearing).  He is unable to corroborate the timing of this letter, however, as Mr. Enzor testified he never received it (despite having an established system for receiving mail), and no external indicia verify if and when it was ever sent.  Rather, according to Mr. Enzor, the first time Moses mentioned plea withdrawal was in 2009.  Doc. 261 at 41-44, 59-60.  Mr. Enzor's account is confirmed inasmuch as Moses did not mention a desire to withdraw his plea in his interview with the probation office, or in a 42-page letter he filed with the Court in February 2009.  See Ex. 2 (admitted at February 4,

46

2010 hearing).  Because Moses's credibility is essentially non-
existent at this point, the Court discounts the letter dated
August 20, 2008, credits Mr. Enzor's testimony, and finds Moses
waited at an excessively long time before moving to withdraw his
plea.  The seventeen-month span between Moses's plea and his
motion is more than enough to place this case in the range where
courts reject attempts to withdraw a guilty plea.  <u>See, e.g.</u>,
<u>Carreto</u>, 583 F.3d at 154 (one year); <u>Doe</u>, 537 F.3d at 209 (five
(five months); <u>Arteca</u>, 411 F.3d at 317 (under one year); <u>Rosen</u>,
409 F.3d at 547 (four months); <u>Schmidt</u>, 373 F.3d at 103 (between
three and eight months); <u>Gonzalez</u>, 970 F.2d at 1100 (seven
months).

       3.   <u>Prejudice to the Government</u>

     The third factor asks whether the government would be
prejudiced by allowing the defendant to withdraw his guilty plea.
<u>Carreto</u>, 583 F.3d at 157.  "[S]ince the burden is on the
defendant to demonstrate valid grounds for withdrawal, where the
defendant has not shown valid grounds for withdrawal, the
Government is not required to show prejudice."  <u>United States v.
Marant</u>, No. 08-5316-cr, 2009 WL 4798861, at *2 (2d Cir. Dec. 15,
2009) (summary order).  Moses has not shown valid grounds for
withdrawing his plea, so the government need not show prejudice
here.  <u>Id.</u>

     Even if the government were required to show prejudice, it
would be easily demonstrated in this case.  Moses pled guilty on

the morning of the fourth day of his criminal trial, after the government had gathered witnesses and exhibits, expended significant resources on the case, and put witnesses at risk by asking them to testify.[12]  Upon Moses's guilty plea the prosecution's efforts were dropped, with the understanding that it was no longer necessary to marshal the evidence against Moses. Seventeen months later, Moses asks the government to revive the prosecution and prepare for trial again.  This is more than enough to create prejudice.[13]  See Carreto, 583 F.3d at 157 ("[T]he Government surely would have encountered difficulties were it required to reassemble its evidence after more than a year's delay.").

IV.   Conclusion

Moses has not met the standard for withdrawing a plea.  His allegations raise no serious question as to the voluntariness of his plea, and the three general factors all weigh against allowing a plea withdrawal here.  Rather than an involuntary or unknowing plea, this appears to be a case of subsequent doubt, where Moses now "believes that he made a bad choice in pleading guilty."  Rosen, 409 F.3d at 547 (internal quotation omitted).

---

[12]  Moses's attempt to have Jorge Burgos killed is the clearest possible illustration that government witnesses were put at risk by testifying in this trial.

[13]  Indeed, even Moses admits it would be difficult to prepare for trial again, due to the length of time elapsed. See Doc. 271 at 6.

Moses moved to withdraw his plea shortly after the draft PSR recommended 30 years' imprisonment; apparently the prospect of serving this sentence made him reconsider his decision. "The fact that a defendant has a change of heart prompted by his reevaluation of . . . the penalty that might be imposed[,] [however,] is not a sufficient reason to permit withdrawal of a plea." Gonzalez, 970 F.2d at 1100. "A guilty plea is no mere formality, but a grave and solemn act." Arteca, 411 F.3d at 319 (internal quotation omitted).

For the foregoing reasons, Moses's motions to withdraw his plea of guilty, Docs. 237 and 272, are DENIED. His request for a bail hearing, Doc. 271, is DENIED.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 7th day of September, 2010.

/s/ J. Garvan Murtha
Honorable J. Garvan Murtha
Senior United States District Judge