UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA,          :
          Plaintiff                :
                                   :
          v.                       :          File No. 1:05-CR-133
                                   :
RICHARD MOSES, JR.,                :
          Defendant                :

RULING ON GOVERNMENT'S MOTION FOR PRELIMINARY ORDER
OF FORFEITURE AND MOTION FOR SUBSTITUTE ASSETS
(Docs. 226 and 231)

I.   Background

     Defendant Richard Moses, Jr. was charged in a 15-count
Superseding Indictment on June 30, 2006.  A trial by jury on all
counts commenced August 6, 2008 and continued August 7, 8 and 11.
On August 11, 2008, while the trial was in progress, Moses pled
guilty to Counts 1, 6 and 12 of the Superseding Indictment.  In
Count 1, Moses admitted to conspiring to distribute more than
five kilograms of cocaine from approximately January 2002 until
August 20, 2005.  In Count 6, Moses admitted to conspiring to
possess a firearm during and in relation to a drug trafficking
crime, namely, the conspiracy to distribute cocaine.  In Count
12, he admitted to attempting to kill a witness, Jorge Burgos, to
prevent him from testifying in the criminal proceeding.

     Count 15 of the Superseding Indictment is a forfeiture
count.  As part of his guilty plea, Moses waived his right to a
jury trial with respect to the forfeiture count.  The government
filed a motion for preliminary order of forfeiture, and a

forfeiture hearing was held on June 1, 2009.  The United States seeks forfeiture of any and all property constituting or derived from the proceeds Moses obtained as a result of the three-year cocaine distribution conspiracy.  The government also seeks forfeiture of any and all property used to facilitate the commission of Moses's cocaine distribution scheme.  Finally, the government seeks forfeiture of various assets as substitute assets to satisfy a money judgment.

Moses recently filed two motions to withdraw his plea of guilty.  Docs. 237, 272.  Those motions are addressed in a separate ruling.

II.  Findings of Fact

A.  Moses's Finances in General

From the late 1990s through September 2002, Moses worked for Home Partners, Inc.  See Ex. 176 at 05090.  From October 2002 through December 2002, Moses worked for DJ Construction.  See id. On his tax return for January through December 2002, Moses stated his gross earned income for the year was $18,674.  Ex. 152 at 04545.  Moses's tax return was supported by W-2 forms from his employers, Home Partners, Inc. (also known as Davidson, Gourley) and DJ Construction.  Id. at 04547, 04548.  Moses reported no business income on his 2002 tax return.  Id. at 04545.  Moses's earned income for 2000 and 2001 was only slightly higher.  For example, in 2001 Moses reported wages of $36,256 and a business

2

loss of $9,840 for car racing, for a total adjusted income of $26,416. Ex. 151. Similarly, in 2000, Moses reported earned wages of $27,192, a business loss for car racing of $3,904, and a total adjusted income of $23,288. Ex. 150.

Moses was unemployed as of January 2003. See Ex. 176 at 05092. At that time, he stated on unemployment claims that he was not currently, nor had he ever been, self-employed. Id. at 05092. He continued to seek unemployment benefits through at least March 15, 2003. Id. at 05082. Each time he submitted a claim, Moses stated he had performed no work and earned or received no wages. See, e.g., id. at 05082, 05086, 05088.

Despite his relatively low income in 2002 and his unemployment in early 2003, Moses made significant cash deposits into his personal bank account at Mascoma Savings Bank. For example, over a two-week period in January 2003, he deposited $2,900 in cash. Ex. 153 at 04191, 04196. Over a fifteen-day period in February 2003, he deposited $2,500 in cash. Id. at 04198, 04205. He deposited $1,500 on May 22, 2002, id. at 04106, $2,400 during an eleven-day period in August 2002, id. at 04145, 04154, and $1,240 on October 1, 2002, id. at 04167.

After he left Home Partners in 2002, Moses had a business known as Brook Run Roofing. See Transcript of Scott Rogers Testimony, June 1, 2009 ("Rogers Tr.") at 15-16. Moses did not earn significant income from this business. Id. at 16-18. He

operated this business with relatives, using it to filter money by giving cash to his relatives, while having checks written to him for the same amount.  Id.  The Internal Revenue Service has no information about a business known as Brook Run Roofing.  Ex. 181 at 05104.

Moses also had a business known as Millstone Masonry or Millstone Construction ("Millstone").  During the years in question, Moses maintained a business bank account at Ledyard National Bank ("Ledyard") for Millstone.  Bank records show little legitimate business-related income to Moses's Millstone account.  See Ex. 158 at 02654-02706; id. at 00867-01020.  By June 30, 2004, the only notable deposit in his business bank account at Ledyard was from Matthew Wood of Wood Builders for $12,000 on June 17, 2004.  See id. at 00892.

Nonetheless, despite Moses's lack of legitimate income, significant cash deposits to his accounts at Mascoma and Ledyard continued in mid-2003 and 2004.  Over a three-week period in May 2003, he deposited $2,943 in cash at Mascoma.  Ex. 153 at 04222, 04230.  Shortly thereafter, on June 17, 2003, he deposited $2,000.  Id. at 04239.  During a two-week period in September 2003, he deposited $3,000 in cash at Mascoma.  Id. at 04258, 04264.  Between October 17, 2003 and November 4, 2003, Moses deposited $2,400 and $2,250 in cash at Mascoma and Ledyard, respectively.  Id. at 04274, 04275; Ex. 158 at 02690, 02692.  In

a one-week period at the end of November 2003, he deposited $3,900 in cash at Ledyard. Ex. 158 at 02695, 02699. Between January 22 and 26, 2004, Moses deposited $1,500 in cash at Ledyard. Id. at 02705, 00873. He deposited $3,750 in cash at Mascoma in February 2004. Ex. 153 at 04286. Moses also regularly deposited endorsed checks from admitted drug users during this time. See, e.g., Ex. 158 at 02695, 02703; Rogers Tr. at 12.

Moses filed no income tax returns and reported no earned income for the taxable years 2003, 2004, or 2005. Ex. 180. He filed no income tax returns and reported no earned income for his businesses, Millstone Masonry or Millstone Construction, for the taxable years 2003, 2004, or 2005. Ex. 181.

Home Partners, Inc., doing business as HP Roofing, reported that for taxable year 2004, it paid Moses's business, Millstone Construction, $12,870. Ex. 193; Ex. 194. The first payment from HP Roofing, however, does not appear in the Millstone account until October 27, 2004, when Moses deposited a check in the amount of $2,940. See Ex. 158 at 00924. After that date, Millstone Construction received four additional checks from HP Roofing for $3,630, $2,800, $1,900, and $1,600, for a total of $12,870. See id. at 00928, 00931, 00940. Home Partners, Inc. reported that for the taxable year 2004, it paid Moses personally $10,392 for work as a subcontractor. Ex. 192; Ex. 194. Moses's

personal account at Mascoma, however, shows no HP Roofing checks deposited during 2004.  Ex. 153 at 04276-04344.

     B.   <u>The Spec Houses</u>

     Despite no reported earned income in 2003 or 2004, and minimal evidence of legitimate work activity in the first half of 2004, Moses deposited $3,500 in cash toward the purchase of 1.5 acres of real property on Baxter Mountain Road in Sharon, Vermont, on April 26, 2004.  Ex. 187 at 05097.  On June 24, 2004, he closed on the purchase of the property, with the previous owner retaining a mortgage deed on the property in the amount of $31,500.  Ex. 188 at 40011, 40018.

     Furthermore, despite having relatively little legitimate paid work activity, Moses financed the construction of a spec house on the Baxter Mountain Road property without taking out a loan.  Shortly after closing on the property in June 2004, Moses deposited significant cash amounts into his Ledyard account.  In a one-month period from July 15, 2004 through August 10, 2004, he deposited $17,600 in cash.  Ex. 158 at 00896, 00899, 00900, 00909, 00910.  He used his Ledyard account to purchase building supplies and to make mortgage payments on the property.  <u>See,</u> <u>e.g.</u>, <u>id.</u> at 00901-00903, 00911-00913.

     No checks from the Ledyard account were written to employees who worked on the spec house.  <u>See</u> <u>id.</u> at 00901-00945. Rather, employees were paid in cash or drugs.  For example, Jim

Chase worked on the spec house, and was paid in cash.  <u>See</u> Ex. 196 at 12; Rogers Tr. at 14, 15.  At least some of that cash was direct proceeds from drug sales.  Rogers Tr. at 15.  In other examples, Rogers was paid with cocaine, and he also knew of another person named "Wayne" who similarly worked at the house and was paid with cocaine.  <u>Id.</u> at 14.  In addition, Moses told Rogers the person who laid the foundation was doing so, at least in part, to pay off a cocaine debt.  <u>Id.</u> at 14-15.  Rogers testified generally that Moses built the house on Baxter Mountain Road with drug proceeds.  <u>Id.</u> at 13-15.

On December 17, 2004, Moses sold the 1.5 acre Baxter Mountain Road property and spec house to private buyers for $175,000.  Ex. 188 at 40012.  At closing, Moses's real estate lawyer, Fred Peet, gave the previous owner a check in the amount of $31,575.21, in satisfaction of the mortgage.  Ex. 187 at 05096.  Moses received a check for $133,773.22 which he deposited in his Ledyard account.  Ex. 158 at 00942.

Moses used the proceeds from the sale of the Baxter Mountain Road property to build and finance a spec house in Thetford, Vermont on property owned by his father-in-law, Richard Powers.  Rogers Tr. at 19-20, 46, 48.  On March 4, 2005, Moses gave Powers a check for the building permit.  Ex. 158 at 00969.  Moses also wrote checks to Powers from his Ledyard account to buy the building materials.  Transcript of Richard Powers Testimony, June

7

1, 2009 ("Powers Tr.") at 7, 16; see also Ex. 158 at 00970.
Powers did not know the source of the money for the construction
of the spec house in Thetford, Vermont.  Powers Tr. at 17.

Moses and his father-in-law worked on the Thetford spec
house in the Spring of 2005, and sold it in September of that
year.  About a month before the sale, on August 2, 2005, Moses
obtained a $15,000 cashier's check from Chittenden Bank, drawn on
the home equity line of credit he shared with his ex-wife,
Crystal Moses.  See Ex. 158 at 01015.  Moses deposited that check
in his Ledyard bank account.  Id. at 01015.  On August 16, 2005,
Moses obtained a $9,000 cashier's check from the Chittenden Bank
home equity credit line and deposited $7,000 of the proceeds in
his Ledyard account.  See id. at 01016.  On August 26, 2009,
Moses obtained a $5,000 cashier's check from the same credit line
and deposited $4,000 in his Ledyard account.  See id. at 01013.
The total amount transferred from the home equity line of credit
to his Ledyard account was $26,000.  Crystal Moses testified that
Moses used the funds from the home equity line of credit to
complete the Thetford property, although she did not identify
particular materials that were purchased.  Transcript of Crystal
Moses Testimony, June 1, 2009 ("Crystal Moses Tr.") at 8-9.  In
grand jury testimony, Powers testified Moses spent about "a
hundred and some thousand dollars on materials."  Doc. 278 at 2
(Sealed Grand Jury Testimony of Richard Powers at 11).

On September 16, 2005, Powers sold the spec house and 6.2
acres of property in Thetford, Vermont to private buyers for
$262,000.  Ex. 189 at 40002.  Four days later, Powers gave Moses
a check in the amount of $135,000 as his contribution to
construction of the spec house.  Ex. 155.  That same day, Moses
deposited the check and obtained six cashier's checks, numbered
200067310 through 200067315, from Mascoma, and paid an
outstanding balance of $330.71 on his overdraft protection
account.  Ex. 156; Ex. 157.  The six cashier's checks and the
overdraft payment totaled $135,000.  Ex. 156; Ex. 157.

Prior to the sale of the Thetford house, in August 2005,
Moses had a balance of less than $20 in his Mascoma account.  Ex.
153 at 04368.  After the sale, on September 22, 2005, Moses
closed the account.  Id. at 04376.

About a week later, on September 30, 2005, Moses purchased
4.8 acres of land in South Royalton, Vermont for $67,000.  Ex.
190 at 40053.  He paid $60,000 toward the South Royalton property
with one of the Mascoma cashier's checks, which was deposited in
the trust account of his real estate lawyer, Alison Gravel.  Ex.
156 at 04015.

Moses deposited three of the remaining Mascoma cashiers'
checks into his account at Ledyard.  On September 20, 2005, he
deposited $9,519.29 (check number 200067315), taking out
$2,519.29 in cash and leaving $7,000 in the account.  Ex. 158 at

01025.  On September 28, 2005, he deposited $10,0000 (check number 200067314), taking out $5,000 in cash and leaving $5,000 in the account.  Id. at 01026.  On October 18, 2005, he deposited $10,000 (check number 200067312).  Id. at 01027.  Moses used his Ledyard account to finance the construction of a third spec house.  See, e.g., id. at 01033.  He was the sole owner of the South Royalton, Vermont property, which was unencumbered by any liens.  Ex. 210.

A few days before his second arrest on March 23, 2006, Moses sold the third spec house in South Royalton, Vermont to Paul Bernier.  Ex. 208 at 20093-20094.  At the closing, Bernier gave Moses a $124,000 check drawn on Citizens Bank.  Id. at 20103-20104.  Bernier also wrote Crystal Moses a check for approximately $42,000 at the closing.  Ex. 208 at 20103.  This check was intended to be repayment of the $29,000 Moses borrowed from the Chittenden home equity line in August 2005.  Crystal Moses Tr. at 41-42.

On March 23, 2006, Moses deposited the $124,000 Bernier check in an account at the Windsor Orange County Credit Union.  Ex. 160 at 00848, 00859.  That same day he withdrew $3,500 in cash from the account, in the form of twenty $100 bills and seventy-five $20 bills.  Id. at 00864.  The government seized the contents of Moses's Windsor Orange Credit Union account on March 24, 2006.  Id. at 00847-00848.  The government also seized $3,500

10

in cash from Moses's person on March 23, 2006, in the form of twenty $100 bills and seventy-five $20 bills.  See Ex. 206.

As a general matter, Scott Rogers testified that Moses used the spec houses to filter drug money.  Rogers Tr. at 33.  He based this testimony on various discussions with Moses.  Id. at 34.

C.   Other Seized Assets

Shortly after selling the Baxter Mountain Road spec house and depositing the proceeds in his Ledyard account, Moses bought a 2004 Bicknell Race Car (I.D. No. 2474) from Troy Gray.  Ex. 207 at 20132.  Moses paid for the race car on January 1, 2005, with a check from his Ledyard account in the amount of $7,000.  Ex. 158 at 00951.  The 2004 Bicknell Race Car was seized by the government after Moses's first arrest on December 8, 2005. Rogers testified generally that Moses used drug proceeds to purchase his race cars.  Rogers Tr. at 12-13.

In November 2005, Moses bought a snowmobile – a 2006 Ski Doo Mach Z 1000, VIN #2BPSAA6C36V000240 – from Lucky's Trailer Sales, Inc.  Ex. 215.  To purchase the snowmobile, Moses wrote a check from his Ledyard account in the amount of $11,449.30.  Ex. 158 at 01036.  The total price was $11,949.30; in addition to the check, Moses apparently paid $500 in cash.  Ex. 215 at 02102.  At the beginning of November, the balance in Moses's Ledyard account was approximately $1,100.  Ex. 158 at 01037.  The check to Lucky's

Trailer was cashed on November 2, 2005, overdrawing the balance in Moses's Ledyard account by $10,296.54.  Id. at 01037.  The following day, Moses deposited a $12,000 cash advance from his MBNA credit card, which cured the overdraft.  Id.  The government seized the 2006 Ski Doo snowmobile after Moses's first arrest.

The government also seized a dual snowmobile trailer, VIN #2MBS368192U042556.  The government has presented no evidence of when this trailer was purchased, how much it cost, or where the purchase money came from.  It is undisputed, however, that the snowmobile trailer was Moses's property at the time it was seized.  See Doc. 231-3 at 4.

When Moses was arrested for the second time, on March 23, 2006, a total of $4,485.02 in cash was seized from his person.  As described above, $3,500 of that cash matched the denominations withdrawn earlier that day from the Windsor Orange County Credit Union.  The government has presented no evidence of where the remaining $985.02 came from.  It is undisputed, however, that the remaining $985.02 was Moses's property at the time it was seized.  See Doc. 231-3 at 2.

D.    The Hatchery

In 1993, Moses and his then-wife Crystal Moses bought 17 acres on Beaver Meadow Road, which included a parcel known as "the Hatchery."  Ex. 191 at 05135.  The Hatchery is also referred to as 1.20 acres of land, and as Lot 1, located on Beaver Meadow

12

Road, Sharon, Vermont.  After Moses and Crystal divorced in April 2002, they began planning to subdivide their Beaver Meadow Road property.  Crystal was to retain the house on Beaver Meadow Road and Moses would receive the Hatchery.  Crystal Moses Tr. at 10-11.  On November 29, 2004, Crystal quit-claimed the Hatchery to Moses.  Ex. 191 at 05112-05113.

Both before and after Crystal quit-claimed the Hatchery, Moses stored drugs and drug money there.  See, e.g., Ex. 197 at 27-28; Ex.199 at 23, 25-26.  He also sold drugs out of the Hatchery, Rogers Tr. at 8; Ex. 196 at 6, and used the Hatchery as a pick-up and drop-off point for drugs and drug money, Ex. 195 at 13-14; Ex. 198 at 14-15.  Moses hid cocaine and money in various locations at the Hatchery, such as glove boxes in abandoned vehicles, compartments, and heating vents.  Ex. 198 at 17-19; Doc. 202 at 7.

On December 13, 2005, five days after his first arrest, Moses quit-claimed the Hatchery to his father, Richard Moses, Sr., for no consideration.  Ex. 191 at 05106.  On January 9, 2006, Richard Moses, Sr. quit-claimed the Hatchery to Todd Dunham for an alleged purchase price of $10,000.  Id. at 05110.  In fact, Dunham paid nothing for the property.  Ex. 207 at 20148.

E.   Overall Cocaine Dealings

Conservatively, Moses sold at least five kilograms of cocaine between January 2002 and August 20, 2005.  Doc. 170 at 1.

13

During the conspiracy, Moses sold cocaine for approximately $1,200 per ounce.  Rogers Tr. at 8.

III. <u>Conclusions of Law</u>

    A.   <u>Proceeds</u>

    Based upon testimony and exhibits admitted at Moses's trial and the June 1, 2009 forfeiture hearing, the United States has shown Moses purchased the Baxter Mountain Road land and constructed a spec house during the time period of the conspiracy.  Moses's lack of legitimate income and substantial cash deposits demonstrate there was no likely source of financing for the Baxter Mountain Road spec home other than drug proceeds. <u>See, e.g.</u>, <u>United States v. Juluke</u>, 426 F.3d 323, 327 (5th Cir. 2005) (per curiam) (affirming inference of drug proceeds where "bank deposits significantly exceeded . . . known legitimate income").  Thus, the United States has presented sufficient evidence to trigger the rebuttable presumption that the Baxter Mountain Road spec house was subject to forfeiture.  <u>See</u> 21 U.S.C. § 853(d).  Moses failed to submit evidence to rebut this presumption.

    From this starting point, any profits or appreciation in value from drug proceeds is forfeitable.  <u>See, e.g.</u>, <u>United States v. Betancourt</u>, 422 F.3d 240, 250-52 (5th Cir. 2005) (affirming forfeiture of lottery winnings, where lottery ticket was paid for with drug proceeds); <u>United States v. One 1980 Rolls</u>

Royce, 905 F.2d 89, 91 (5th Cir. 1990) (noting any profits, appreciation or income from drug money proceeds is also forfeitable); United States v. Kalish, No. 06-CR-656, 2009 WL 130215, at *6 (S.D.N.Y. Jan. 13, 2009) (unpublished) (finding securities forfeitable when initially purchased through proceeds of criminal activity, even after substantial appreciation in value).  Therefore the proceeds from the sale of the Baxter Mountain Road real estate were also forfeitable.

The United States has shown that the proceeds of $133,375.22 from the sale of the Baxter Mountain Road spec house were deposited in Moses's Ledyard account.  After this deposit, Moses's Ledyard account consisted almost entirely of money from the Sharon spec house sale.  Moses then withdrew funds from this account to finance the building of the spec house in Thetford, Vermont.  Moses financed the construction of the Thetford, Vermont spec house during the time period of the conspiracy or relatively shortly thereafter, while at the same time failing to report any legitimate income.  See Juluke, 426 F.3d at 327. Given these facts, the United States has triggered the rebuttable presumption that Moses's proceeds of $135,000 from the sale of the Thetford, Vermont property are forfeitable.  See 21 U.S.C. § 853(d); Betancourt, 422 F.3d at 250-52.

Moses presented some evidence to rebut the presumption, with respect to the Thetford spec house.  In particular, he

demonstrated that he used approximately $26,000 from an untainted source — the Chittenden Bank home equity line of credit — to finance a portion of the Thetford, Vermont spec house.  Crediting Powers' testimony that Moses spent approximately $100,000 on materials for the Thetford property, approximately 26% of the materials were purchased with untainted money.  Moses received $135,000 from the sale of the Thetford property.  Pro-rated accordingly, 26% of the this sum represents untainted money.  Cf. Pacheco v. Serendensky, 393 F.3d 348 at 354-55 (2d Cir. 2004) (allowing partial forfeiture of property).

The United States has shown by a preponderance of the evidence that Moses used money from the sale of the Thetford property to purchase and finance the third spec house in South Royalton, Vermont.  At a minimum, Moses used a $60,000 cashier's check to purchase the real property, and deposited three other cashier's checks in his Ledyard account for a total of $22,000.  Thus at least $82,000 of the proceeds from the sale of the Thetford property were used toward the South Royalton property.

The South Royalton spec house was sold, yielding $124,000 for Moses and $42,000 for Crystal.  Moses's portion represents approximately 74% of the sale proceeds, whereas the payment to Crystal represents approximately 26% of the total.  These proportions almost exactly match the ratio of tainted to untainted inputs for the Thetford property.  The Court

16

accordingly regards the $42,000 payment to Crystal as
representing the yield from the untainted input to the Thetford
property (the home equity loans), passed through the two house
sales.  The $124,000 received by Moses, in turn, represents the
yield from the unclean inputs to the Thetford house, passed
through to the South Royalton house.  Cf. Pacheco, 393 F.3d at
354-55; Kalish, 2009 WL 130215, at *6.  This apportionment of the
South Royalton proceeds is supported by the evidence, which shows
the payment to Crystal was intended to be reimbursement for the
home equity loans (the clean money) used on the Thetford house.
Thus, the Court finds all $124,000 of Moses's proceeds from the
South Royalton house constitute unclean money.

Moses deposited his $124,000 check from the South Royalton
sale in his account at Windsor Orange County Credit Union, which
at the time had a negative balance.  The government subsequently
seized this account.  Because the seized contents of Moses's
Windsor Orange account are directly traceable to the tainted
proceeds from the South Royalton spec house sale, the Court finds
they are subject to forfeiture as proceeds of the drug
conspiracy.  See 21 U.S.C. § 853(a)(1).

Moses withdrew in cash $3,500 of the South Royalton proceeds
before the government seized his Windsor Orange account.  This
cash took the form of twenty $100 bills and seventy-five $20
bills.  Cash in exactly these denominations was found on Moses's

17

person at the time of his arrest.  Based on the short time period between withdrawal and arrest, and the precisely matching denominations, the Court finds $3,500 of the cash seized from Moses's person came from the tainted proceeds of the South Royalton sale, and is forfeitable as proceeds of the drug conspiracy.  See 21 U.S.C. § 853(a)(1).

Through bank records, income tax records or the lack thereof, and the testimony of Scott Rogers, the United States has introduced evidence sufficient to trigger the rebuttable presumption that the 2004 Bicknell race car, I.D. No. 2474, is forfeitable.  See 21 U.S.C. § 853(d).  The United States has shown Moses purchased the 2004 Bicknell race car during the time period of the conspiracy and that Moses had a lack of legitimate income.  More specifically, the United States has shown that Moses purchased the 2004 Bicknell race car with funds from his Ledyard account after depositing the proceeds of the Baxter Mountain Road spec house — shown to be tainted money — in that account.  Moses submitted no evidence to the contrary, and therefore failed to rebut the presumption.  The 2004 Bicknell race car is accordingly subject to forfeiture as proceeds of the drug conspiracy.  See 21 U.S.C. § 853(a)(1).

The government presented evidence that the 2004 Ski Doo Mach Z 1000 snowmobile was acquired during the conspiracy, but financial records clearly show Moses bought it with money from a

credit card advance, rather than with drug money.  This rebuts
any presumption that the snowmobile is forfeitable.  To the
extent Moses made payments on the cash advance with drug money,
the snowmobile may have become partially tainted, but the
government introduced no evidence on that issue.  Accordingly,
the Court finds the 2004 Ski Doo Mach Z 1000 snowmobile does not
constitute proceeds of the drug conspiracy.

The government presented no evidence on the origins of the
dual snowmobile trailer.  The Court therefore has no basis for
considering it proceeds of Moses's drug conspiracy.

The government similarly presented no evidence on the
origins of the remaining $985.02 in cash seized from Moses's
person on the date of his second arrest.  The Court in turn has
no basis for considering it proceeds of Moses's drug conspiracy.

B.   Money Judgment and Substitute Assets

To the extent the above assets are not forfeitable as
proceeds or facilitating property, the government requests they
be held forfeitable as substitute assets against a money
judgment.  The Second Circuit recently confirmed that money
judgments based on a defendant's estimated earnings from selling
drugs are appropriate under 21 U.S.C. § 853(a).  See United
States v. Awad, 598 F.3d 76 (2d Cir. 2010).  Using a conservative
quantity of five kilograms sold during the conspiracy and a sale
price or street value of $1,200 per ounce, Moses earned gross

19

receipts or proceeds of $211,642.80.  Accordingly, the United States is entitled to a money judgment in the amount of $211,642.80, less the value of any assets seized as proceeds.  21 U.S.C. § 853(a); Awad, 598 F.3d at 76.

Because the total value of all assets seized as proceeds is less than $211,642.80 and the government has met the statutory requirements for substitution, the remaining assets not forfeitable as proceeds shall be forfeited as substitute assets to satisfy the money judgment.  See Doc 231-4 (Carbo affidavit concluding Moses commingled his drug proceeds); United States v. Seher, 562 F.3d 1344, 1372-73 (11th Cir. 2009) (affirming the substitution of assets under 21 U.S.C. § 853(p), based on a similar affidavit).  Thus, the remaining $985.02 in U.S. currency, the 2004 Ski Doo Mach Z 1000 snowmobile, and the dual snowmobile trailer are forfeitable as substitute assets (but not the Hatchery, which is discussed separately in the following section).

    C.  Facilitating Property

Moses owned and used the Hatchery, also referred to as 1.20 acres of land, during the time period of the conspiracy. Numerous witnesses and co-conspirators testified that drug transactions in furtherance of the conspiracy took place frequently at the Hatchery.  The government has provided ample evidence establishing a nexus between the Hatchery and Moses's

drug offenses.  See, e.g., Juluke, 426 F.3d at 326-27 (affirming forfeiture of real property when defendant stored drugs in car parked at property).  Accordingly, this property became subject to forfeiture as facilitating property under 21 U.S.C. § 853(a)(2) at the moment Moses used it for the commission of his crimes.  See 21 U.S.C. § 853(c).

The Hatchery was subsequently acquired by Richard E. Moses, Sr. and Todd Dunham, but neither of these individuals paid consideration for the property.  Thus, neither Richard E. Moses, Sr. nor Todd Dunham qualifies as a "bona fide purchaser for value" under 21 U.S.C. § 853(c), and the transfers of ownership did not change the status of the Hatchery as forfeitable.  See, e.g., In re Bryson, 406 F.3d 284, 290-91 (4th Cir. 2005).

IV.  Conclusion

The following assets are subject to forfeiture as proceeds of Moses's drug conspiracy:

(1)  The contents of Moses's account at Windsor Orange County Credit Union (Account No. 504001);

(2)  $4,485.02 in U.S. currency seized on March 23, 2006;

(3)  The 2004 Bicknell Race Car, I.D. No. 2474.

The following assets are subject to forfeiture as substitute assets to satisfy a money judgment based on the proceeds of the drug conspiracy:

(4)   The 2006 SkiDoo Mach Z 1000 snowmobile,

VIN #2BPSAA6C36V000240;

(5)   The dual snowmobile trailer, VIN #2MBS368192U042556.

The following property is subject to forfeiture as
facilitating property for Moses's drug conspiracy:

(6)   Real property of 1.20 acres, known as the Hatchery and

also as Lot 1, located on Beaver Meadow Road in Sharon,

Vermont.

Counsel for the government shall forthwith submit for the
Court's consideration a proposed Preliminary Order of Forfeiture
consistent with this Ruling.

Dated at Brattleboro, in the District of Vermont, this 7th
day of September, 2010.

/s/ J. Garvan Murtha
Honorable J. Garvan Murtha
Senior United States District Judge